Michael B. Eisenkraft
ID: 016532004
COHEN MILSTEIN SELLERS
    & TOLL PLLC
88 Pine Street / 14th Floor
New York, NY 10005
Tel. (212) 838-7797
meisenkraft@cohenmilstein.com

Steven J. Toll (*pro hac vice* forthcoming)
Julie Goldsmith Reiser (admitted *pro hac vice*)
S. Douglas Bunch (*pro hac vice* forthcoming)
Adam H. Farra (admitted *pro hac vice*)
COHEN MILSTEIN SELLERS
    & TOLL PLLC
1100 New York Avenue, N.W. / 5th Floor
Washington, D.C. 20005
Tel. (202) 408-4600
stoll@cohenmilstein.com
jreiser@cohenmilstein.com
dbunch@cohenmilstein.com
afarra@cohenmilstein.com

*Counsel for Plaintiffs*

NEW YORK CITY EMPLOYEES'
RETIREMENT SYSTEM, *et al.*,

Plaintiffs,

        *v.*

VALEANT PHARMACEUTICALS
INTERNATIONAL, INC., *et al.*,

 Defendants.

Case No.: 3:18-cv-00032

# PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
# DEFENDANTS' PARTIAL MOTIONS TO DISMISS

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 4

I.     PARTICIPANTS IN THE VALEANT ENTERPRISE.................................................... 4

II.    THE VALEANT ENTERPRISE AND FRAUDULENT SCHEME.............................. 7

   A.    Valeant's Deceptive Business Model ............................................................ 7

   B.    PwC's Concealment of Valeant's Relationship with Philidor and Violation of Core
Accounting Rules .......................................................................................... 8

   C.    Misrepresentations in Furtherance of the Scheme ....................................... 9

III.   REVELATION OF THE VALEANT ENTERPRISE AND FRAUDULENT SCHEME 10

ARGUMENT ....................................................................................................................... 12

I.     THE COMPLAINT ADEQUATELY ALLEGES VIOLATIONS OF THE NEW
JERSEY RICO ACT ........................................................................................... 13

   A.    Plaintiffs Adequately Allege Primary Violations of the New Jersey RICO Act ........ 13

     1.   Plaintiffs Adequately Allege an "Enterprise"........................................ 13

       a.   Plaintiffs Allege a Distinct Enterprise and Pattern of Racketeering Activity......... 14

       b.   Plaintiffs Adequately Allege the Division of Functions Within the Enterprise...... 18

     2.   Plaintiffs Adequately Allege Racketeering Activity ................................ 21

       a.   Securities Fraud Is a Predicate Act Under New Jersey's RICO Statute ................ 22

       b.   Plaintiffs Adequately Allege a Pattern of Racketeering Activity as to PwC, Carro,
and Schiller ............................................................................... 23

         i.   PwC ......................................................................... 23

         ii.   Carro ...................................................................... 25

         iii.  Schiller................................................................... 26

     3.   Plaintiffs Adequately Allege RICO Injury .............................................. 27

   B.    Plaintiffs Adequately Allege Conspiracy in Violation of the New Jersey RICO
Act ............................................................................................................... 30

     1.   PwC .................................................................................................... 31

     2.   Valeant and Rosiello.......................................................................... 33

     3.   Carro .................................................................................................. 35

     4.   Schiller............................................................................................... 35

II. THE COMPLAINT ADEQUATELY ALLEGES VIOLATIONS OF THE EXCHANGE ACT ........................................................................................................... 38

   A. Plaintiffs Adequately Allege PwC's Violations of Section 10(b) ............................ 38

     1. Legal Standard ................................................................................................ 38

     2. Plaintiffs Allege that PwC Knowingly Violated GAAS, Overlooked  "Red Flag" Indicators of Fraud, and Accorded Special and Differential Disclosure Treatment to Philidor ................................................................................... 39

     3. The Totality of the Circumstances Suggests That the Inference That PwC Knew of Valeant's Desire to Conceal Its Relationship with Philidor Is at Least as Strong as Any Opposing Inference .............................................................. 43

     4. PwC's Remaining Arguments Fail ................................................................. 44

   B. Plaintiffs' Section 18 Claims Against the Valeant Defendants Are Timely ............ 46

     1. Plaintiffs' Claims Are Timely Under a One-Year Statute of Limitations ................. 46

     2. Plaintiffs' Claims Are Timely Under a Three-Year Statute of Repose ..................... 47

     3. The Sarbanes-Oxley Act Expanded Section 18's Limitation Periods ....................... 48

III. THE COMPLAINT ADEQUATELY ALLEGES COMMON LAW CLAIMS ............. 50

   A. Plaintiffs Adequately Allege Claims for Common Law Fraud ................................. 50

   B. Plaintiffs Adequately Allege Claims for Aiding and Abetting Fraud ....................... 51

     1. Valeant, Rosiello, and Pearson ...................................................................... 51

     2. PwC ................................................................................................................ 53

     3. Schiller ........................................................................................................... 57

     4. Carro .............................................................................................................. 58

   C. Plaintiffs Adequately Allege Negligent Misrepresentation Claims ......................... 58

CONCLUSION ............................................................................................................. 62

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*300 Broadway v. Martin Friedman Assocs., P.C.*,
  No. 08-5514 (KSH), 2009 WL 3297558 (D.N.J. Oct. 13, 2009)..............................................15

*In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*,
  No. 03 MD 1529 (LMM), 2005 WL 1679540 (S.D.N.Y. Jul 18, 2005)...........................48, 49

*In re Advanced Battery Techs., Inc.*,
  781 F. 3d 638 (2d Cir. 2015)......................................................................................................39

*American Pipe & Const. Co. v. Utah*,
  414 U.S. 538 (1974)......................................................................................................46, 47, 50

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)....................................................................................................................12

*Athale v. SinoTech Energy Ltd.*,
  No. 11 Civ. 0531(AJN), 2014 WL 687218 (S.D.N.Y. Feb. 21, 2014) ......................................39

*Banco Popular N. Am. v. Gandi*,
  184 N.J. 161 (2005) ....................................................................................................................50

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................................................12, 56

*Bogart v. Nat'l Cmty. Banks, Inc.*,
  No. 90-5032, 1992 WL 203788 (D.N.J. Apr. 25, 1992)............................................................60

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997)....................................................................................................39

*Cafaro v. HMC Int'l, LLC*,
  No. 07-2793 (JLL), 2009 WL 1622825 (D.N.J. June 10, 2009).................................................56

*Cal. Pub. Emps. Ret. Sys. v. ANZ Sec., Inc.*,
  137 S. Ct. 2042 (2017).................................................................................................................49

*Capitol First Corp. v. Todd*,
  No. 04-6439 (MLC), 2006 WL 3827329 (D.N.J. Dec. 27, 2006) ............................................22

*Cast Art Indus., LLC v. KPMG LLP*,
  209 N.J. 208 (2012) ............................................................................................................58, 59

*Cetel v. Kirwan Fin. Group, Inc.*,
   460 F.3d 494 (3d Cir. 2006)........................................................................17

*Circle Bus. Credit, Inc. v. Becker*,
   No. 92-3177, 1994 WL 52848 (E.D. Pa. Feb. 18, 1994) .........................................55

*City of Edinburgh Council v. Pfizer, Inc.*,
   754 F.3d 159 (3d Cir. 2014)........................................................................41

*In re Cmty. Bank of N. Virginia*,
   622 F.3d 275 (3d Cir. 2010), *as amended* (Oct. 20, 2010) ....................................46

*Cornell Capital Partners, L.P. v. Eagle Broadband, Inc.*,
   No. 03-1860 (WGB), 2006 WL 1098175 (D.N.J. Mar. 28, 2006) .........................................59

*Crump v. Passaic Cty.*,
   147 F. Supp. 3d 249 (D.N.J. 2015) ................................................................46, 47

*Dare Invs., LLC v. Chicago Title Ins. Co.*,
   No. 10-6088 (DRD), 2011 WL 2600594 (D.N.J. June 29, 2011)...........................................15

*Dekalb Cty. Pension Fund v. Transocean Ltd.*,
   817 F.3d 393 (2d Cir. 2016), *as amended* (Apr. 29, 2016), *cert. denied*, 137 S.
   Ct. 2326, 198 L. Ed. 2d 755 (2017) ................................................................49

*Discovery Global Citizens Master Fund, Ltd. v. Valeant Pharms. Int'l, Inc.*,
   No. 16-7321 (MAS) (LHG), 2018 U.S. Dist. LEXIS 6219 (D.N.J. Jan. 12,
   2018) ................................................................................................48

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)...................................................................................27

*In re Dynex Capital, Inc.*,
   No. 05 Civ. 1897 (HB), 2009 U.S. Dist. LEXIS 96527 (S.D.N.Y. Oct. 19,
   2009) ................................................................................................28

*E. Dickerson & Son, Inc. v. Ernst & Young, LLP*,
   179 N.J. 500 (2004) ..................................................................................59

*Emcore Corp. v. PwC LLP*,
   102 F. Supp. 2d 237 (D.N.J. 2000) ................................................................24, 33

*Fagan v. Fischer*,
   No. 14-7013 (FLW)(TJB), 2016 WL 347318 (D.N.J. Jan. 28, 2016) ........................17, 29, 36

*Fairfax Fin. Holdings Ltd. v. S.A.C. Capital Mgmt., L.L.C.*,
   160 A.3d 44 (App. Div. 2017) ......................................................................18, 21

*Fimbel v. Fimbel Door Corp.*,
  No. 14-1915 (FLW)(DEA), 2014 WL 6992004 (D.N.J. Dec. 10, 2014) .......................... 17, 28

*Ford Motor Co. v. Edgewood Props., Inc.*,
  No. 06-1278, 2009 WL 150951 (D.N.J. Jan. 20, 2009) ................................................ 17, 18, 19

*Galicki v. New Jersey*,
  No. 14-169 (JLL), 2016 WL 4950995 (D.N.J. Sept. 15, 2016) ........................................ 15, 21

*Gennari v. Weichert Co. Realtors*,
  148 N.J. 582 (1997) ............................................................................................................. 50

*GSC Partners CDO Fund v. Washington*,
  368 F.3d 228 (3d Cir. 2004) ................................................................................................ 45

*H. Rosenblum, Inc. v. Adler*,
  461 A.2d 138 (1983) ............................................................................................................ 58

*Hollis-Arrington v. PHH Mortg. Corp.*,
  No. 05-2556 (FLW), 2005 WL 3077853 (D.N.J. Nov. 15, 2005) ..................................... 15, 16

*Holmes v. Sec. Inv'r Prot. Corp.*,
  503 U.S. 258 (1992) ............................................................................................................. 29

*In re IKON Office Sols., Inc.*,
  277 F.3d 658 (3d Cir. 2002) ................................................................................................ 44

*In re Ins. Brokerage Antitrust Litig.*,
  MDL No. 1663, 2017 WL 3642003 (D.N.J. Aug. 23, 2017) ................................................ 24

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) ............................................................................................ 38, 44

*In re Integrity Ins. Co.*,
  573 A.2d 928 (App. Div. 1990) ........................................................................................... 55

*Janus Capital Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011) ............................................................................................................. 26

*Joaquin v. Lonstein Law Office, P.C.*,
  No. 15-8194 (MAS) (DEA), 2017 WL 2784708 (D.N.J. June 27, 2017)
  (Shipp, J.) ............................................................................................................................ 17

*Kaufman v. I–Stat Corp.*,
  735 A.2d 606 (App. Div. 1999), *rev'd*, 165 N.J. 94 (2000) ................................................ 61

*Kedra v. Schroeter*,
  876 F.3d 424 (3d Cir. 2017) ................................................................................................ 12

*Kelley v. Rambus, Inc.*,
    No. C 07-01238 JF, 2008 WL 1766942 (N.D. Cal. Apr. 17, 2008) .......................................48

*Klein v. Autek Corp.*,
    147 F. App'x 270 (3d Cir. 2005) ...........................................................45

*The Knit With v. Knitting Fever Inc.*,
    625 F. App'x 27 (3d Cir. 2015) ........................................................34, 35

*Kronfeld v. First Jersey Nat'l Bank*,
    638 F. Supp. 1454 (D.N.J. 1986) ..........................................................50

*Lerch v. Citizens First Bancorp, Inc.*,
    805 F. Supp. 1142 (D.N.J. 1992) ..........................................................59

*Maio v. Aetna, Inc.*,
    221 F.3d 472 (3d Cir. 2000)...............................................................28

*Maxim Sewerage Corp. v. Monmouth Ridings*,
    640 A.2d 1216 (N.J. Super. Ct. Law. Div. 1993) .......................................18

*Mayo, Lynch & Assocs., Inc. v. Pollack*,
    799 A.2d 12 (N.J. Super. Ct. App. Div. 2002)......................................31, 32

*McCarthy v. Recordex Serv., Inc.*,
    80 F. 3d 842 (3d Cir. 1996)...............................................................29

*Meridian Horizon Fund, LP v. KPMG (Cayman)*,
    487 F. App'x 636 (2d Cir. 2012) ........................................................57

*Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*,
    500 F.3d 171 (2d Cir. 2007)...............................................................29

*Metz v. United Ctys. Bancorp.*,
    61 F. Supp. 2d 364 (D.N.J. 1999) .........................................................23

*In re MicroStrategy, Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) ....................................................43

*In re Midlantic Corp. S'holder Litig.*,
    758 F. Supp. 226 (D.N.J. 1990) ..........................................................59

*Miller v. P.G. Lewis & Assoc.*,
    No. 05-5641(FLW), 2007 WL 316446 (D.N.J. Jan. 30, 2007)............................56

*Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*,
    331 F.3d 406 (3d Cir. 2003)...............................................................51

*Myrus Hack, LLC v. McDonald's Corp.*,
  No. 05-2700, 2009 U.S. Dist. LEXIS 25765 (D.N.J. Mar. 27, 2009)....................................29

*Nuveen Mun. Tr. ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith
  Brown, P.C.*, 692 F.3d 283 (3d Cir. 2012) ...............................................................50

*Oaktree Capital Mgmt., L.P. v. KPMG*,
  963 F. Supp. 2d 1064 (D. Nev. 2013) ...................................................................48

*In re ORFA Sec. Litig.*,
  654 F. Supp. 1449 (D.N.J. 1987) .........................................................................50

*Parrino v. Swift*,
  No. 06-0537, 2006 WL 1722585 (D.N.J. June 19, 2006)..........................................15

*People Express Airlines v. Consol. Rail Corp.*,
  100 N.J. 246 (1985) .....................................................................................30, 61, 62

*In re Pfizer Inc. Sec. Litig.*,
  No. 04 Civ. 9866 (LTS)(HBP), 2012 U.S. Dist. LEXIS 39454 (S.D.N.Y. Mar.
  22, 2012) ................................................................................................26, 53

*Phillips v. Cty. of Allegheny*,
  515 F.3d 224 (3d Cir. 2008)...............................................................................12

*Princeton Ophthalmic, LLC v. Corinthian Ophthalmic, Inc.*,
  No. 14-CV-05485 (PGS), 2017 WL 4543688 (D.N.J. Oct. 10, 2017) ....................................59

*Prudential Ins. Co. of Am. v. Bank of Am., Nat'l Ass'n*,
  14 F. Supp. 3d 591 (D.N.J. 2014) ...................................................................17, 18

*Prudential Ins. Co. of Am. v. Bank of Am., Nat'l Ass'n*,
  No. 13-1586 (SRC), 2015 WL 502039 (D.N.J. Feb. 5, 2015)....................................60, 61, 62

*Prudential Ins. Co. of Am. v. Credit Suisse Sec. (USA) LLC*,
  No. 12-7242 (KSH), 2013 WL 5467093 (D.N.J. Sept. 30, 2013) ...............................17, 18, 60

*Prudential Ins. Co. of Am. v. Goldman, Sachs & Co.*,
  No. 12-6590 (SDW)(MCA), 2013 WL 1431680 (D.N.J. Apr. 9, 2013)....................17, 22, 60

*In re Refco Inc. Sec. Litig.*,
  826 F. Supp. 2d 478 (S.D.N.Y. 2011)...............................................................17, 21

*Reves v. Ernst & Young*,
  494 U.S. 56 (1990)........................................................................................28

*Royale Luau Resort, LLC v. Kennedy Funding, Inc.*,
  No. 07-1342 (HAA), 2008 WL 482327 (D.N.J. Feb. 19, 2008)..............................................17

*In re Scottish Re Grp. Sec. Litig.*,
 524 F. Supp. 2d 370 (S.D.N.Y. 2007) ................................................................. 39

*Shan Indus., LLC v. Tyco Int'l (US) Inc.*,
 No. 04-1018 (HAA), 2005 U.S. Dist. LEXIS 37983 (D.N.J. Sept. 12, 2005) ........ 18

*Shapiro v. UJB Fin. Corp.*,
 964 F.2d 272 (3d Cir. 1992) .................................................................................. 59

*Shtutman v. Carr*,
 No. A-1064-15T1, 2017 WL 4402045 (N.J. Super. Ct. App. Div. Oct. 4, 2017) ... 60

*Slimm v. Bank of Am. Corp.*,
 No. 12-5846 (NLH/JS), 2013 WL 1867035 (D.N.J. May 2, 2013) ........................ 17

*Starr Invs. Cayman II, Inc. v. China MediaExpress Holdings, Inc.*,
 No. 11-233-RGA, 2014 WL 4180331 (D. Del. Aug. 21, 2014) ............................ 55

*State, Dep't of Treasury, Div. of Inv. ex rel. McCormac v. Qwest Commc'ns Int'l,
 Inc.*, 904 A.2d 775 (App. Div. 2006) ............................................................... 55, 56

*State v. Ball*,
 632 A.2d 1222 (App. Div. 1993) ("*Ball I*"), ....................................................... 16

*State v. Ball*,
 141 N.J. 142 (App. Div. 1995) ("*Ball II*") .................................................. *passim*

*State v. Bisaccia*,
 724 A.2d 836 (App. Div. 1999) ............................................................................ 17

*State v. Cagno*,
 211 N.J. 488 (2012) ...................................................................................... 20, 30

*State v. Carbone*,
 10 N.J. 329 (1952) ............................................................................................... 30

*State v. Motley*,
 No. A-0406-04T4, 2006 WL 848296 (App. Div. Apr. 3, 2006) ........................... 21

*State v. Samuels*,
 189 N.J. 236 (2007) ............................................................................................. 30

*Sun v. Han*,
 No. 15-703 (JLL), 2015 WL 9304542 (D.N.J. Dec. 21, 2015) .............. 39, 40, 42, 43

*In re Suprema Specialties, Inc. Sec. Litig.*,
 438 F.3d 256 (3d Cir. 2006) ........................................................................ *passim*

*T. Rowe Price Growth Stock Fund, Inc. v. Valeant Pharms. Int'l, Inc.*,
No. 16-5034 (MAS) (LHG), 2018 U.S. Dist. LEXIS 6134 (D.N.J. Jan. 12,
2018) ...................................................................................................................26, 35, 48

*Tarr v. Ciasulli*,
181 N.J. 70 (2004) ...........................................................................................51, 52

*Teachers Ret. Sys. of La. v. Qwest Commc'ns Int'l Inc.*,
No. 04CV0782REBCBS, 2005 WL 2359311 (D. Colo. Sept. 23, 2005) .........................49, 56

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ................................................................................... *passim*

*Tosti v. City of Los Angeles*,
754 F.2d 1485 (9th Cir. 1985) ...........................................................................47

*In re Tyco Int'l, Ltd.*,
No. MDL 02-1335-B, 2007 WL 1703023 (D.N.H. June 11, 2007) ........................22

*United States v. Caraballo-Rodriguez*,
726 F.3d 418 (3d Cir. 2013) ...............................................................................31

*United States v. Carbo*,
572 F.3d 112 (3d Cir. 2009) ...............................................................................57

*United States v. Cartwright*,
359 F.3d 281 (3d Cir. 2004) ...............................................................................31

*United States v. Dougherty*,
98 F. Supp. 3d 721 (E.D. Pa. 2015) ...................................................................30

*United States v. Fullmer*,
584 F.3d 132 (3d Cir. 2009) ..........................................................................30, 31

*United States v. McKee*,
506 F.3d 225 (3d Cir. 2007) ..........................................................................30, 31

*Urbach v. Sayles*,
779 F. Supp. 351 (D.N.J. 1991) .........................................................................59

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
No. 15-7658 (MAS) (LHG), 2017 U.S. Dist. LEXIS 66037 (D.N.J. Apr. 28,
2017), ......................................................................................................... *passim*

*WM High Yield Fund v. O'Hanlon*,
No. 04-3423, 2005 WL 6788446 (E.D. Pa. May 13, 2005) ..................................48

ix

*In re Zenith Labs. Sec. Litig.*,
  No. 86-3241A, 1993 WL 260683 (D.N.J. Feb. 11, 1993) ......................................................59

**STATUTES**

15 U.S.C. § 78r ............................................................................................................ *passim*

N.J. Stat. Ann. § 2C:41-1, *et seq.*................................................................................ *passim*

Sarbanes-Oxley Act, 28 U.S.C § 1658(b)........................................................................46, 48, 49

**RULES**

Fed. R. Civ. P. 8(a) ............................................................................................................29

Fed. R. Civ. P. 9(b) ........................................................................................................25, 29

Fed. R. Civ. P. 12(b)(6)........................................................................................................12

**OTHER AUTHORITIES**

Restatement (Second) of Torts § 552.........................................................................................62

S. Rep. No. 107-146, pp. 2-11 (2002).........................................................................................48

Plaintiffs, the New York City Funds, consisting of New York City Employees' Retirement System ("NYCERS"); the New York City Police Pension Fund ("Police"); the Board of Education Retirement System of the City of New York ("BERS"); the Teachers' Retirement System of the City of New York ("TRS"); the Teachers' Retirement System of the City of New York Variable Annuity Program ("TRS Variable A"); the New York City Fire Pension Fund ("Fire"); the New York City Fire Officers' Variable Supplements Fund ("Fire Officers"); the New York City Fire Fighters' Variable Supplements Fund ("Fire Variable"); and the New York City Deferred Compensation Plan ("DCP") respectfully submit this memorandum in opposition to partial motions to dismiss filed by PricewaterhouseCoopers LLP ("PwC") (Dkt. No. 48); Valeant Pharmaceuticals International, Inc. ("Valeant" or the "Company"), Robert Rosiello, Deutsche Bank Securities Inc. ("Deutsche Bank"), and Barclays Capital Inc. ("Barclays") (Dkt. No. 50); Tanya Carro (Dkt. No. 51); J. Michael Pearson (Dkt. No. 52); and Howard B. Schiller (Dkt. No. 53).[1]

## **PRELIMINARY STATEMENT**

Historically, the most brazen frauds are characterized by schemes that, like Valeant's, are intricate, highly coordinated, and thoroughly planned and executed. It is only after untangling the web of illegally formed and thematically named chess entities, as well as upon revealing the Valeant employees behind their pseudonyms, that the underlying activities prove fraudulent and designed to make money by deceiving investors into funding the enterprise. In this case, the New York City Funds became one of Defendants' unwitting victims.

Defendants' enterprise (the "Valeant Enterprise" or "Enterprise") and fraudulent scheme

---

[1] Defendants Pearson, Schiller, Rosiello, and Carro are referred to as the "Individual Defendants" and, with Valeant, as the "Valeant Defendants." Defendants Barclays and Deutsche Bank are referred to as the "Bank Offering Defendants." PwC, the Valeant Defendants, and the Bank Offering Defendants are collectively the "Defendants."

was straightforward: rather than invest in research and development for its own nascent drugs, Valeant acquired pharmaceutical companies whose research and development had already panned out.  Valeant acquired these companies for the sole purpose of selling their drugs at astronomically higher prices.  To enable this price gouging, Valeant established a covert network of pharmacies led by Philidor, which acquired the pharmacy network in part by misrepresenting its ownership structure to state regulators.  That network, in turn, avoided competition with generic drugs by adopting myriad fraudulent tactics to ensure that consumers were forced to purchase Valeant-branded drugs even when generics were prescribed or should have been substituted by state law.

Philidor became a critical component of Valeant's revenue growth.  With PwC's assistance, Valeant entered into a purchase option agreement to acquire Philidor that allowed it to control Philidor's operations while keeping the acquisition concealed from investors.  Each of the Defendants repeatedly disseminated materially false or misleading statements to investors about Valeant's organic and sustainable growth to induce investments in Valeant that would further fuel the Valeant Enterprise's pharmaceutical acquisitions and drug sales.  When news reports revealed that Valeant's growth was built on this unsustainable model, the prices of its securities plummeted, causing the New York City Funds millions of dollars in losses.

Each of the Defendants acted to further the Valeant scheme.  The Company's top executives, namely Pearson and Schiller, devised the scheme.  Along with Rosiello and Carro, these Defendants relayed the false and misleading statements at issue in this case to the New York City Funds in filings with the U.S. Securities and Exchange Commission ("SEC") and elsewhere.  PwC, despite having intricate knowledge of Valeant's relationship with Philidor – including having reviewed Philidor's books and being privy to the secret Philidor purchase

option agreement – audited Valeant's financial statements and certified that they were accurate, that they complied with U.S. generally accepted accounting principles ("GAAP"), that they were audited in accord with generally accepted accounting standards ("GAAS"), and that Valeant had adequate internal controls over financial reporting and disclosure.  Deutsche Bank and Barclays were the purveyors of Valeant's debt securities to the New York City Funds, and themselves had a long history with Valeant, its business model, and its acquisitions.

Consistent with this Court's prior orders, Defendants have not challenged the Section 10(b) claims against Valeant, Pearson, Schiller, Rosiello, and Carro.  Thus, the Court's conclusion that a strong inference of scienter exists as to each of them, in addition to the requisite false statements and loss causation, must be given force and effect in considering the instant challenges to the adequacy of the Complaint.  These rulings, plus additional allegations pled in the Complaint, offer strong support for the New York City Funds' Section 10(b) claims against PwC, New Jersey RICO Act claims against both the Valeant Defendants and PwC, as well as Section 18 claims against certain of the Defendants and common law claims for fraud, aiding and abetting fraud, and negligent misrepresentation.

Contrary to Defendants' assertions that the Complaint should be partially dismissed, Plaintiffs have adequately pled the structure of the Valeant Enterprise and that the Valeant Defendants and PwC engaged in a "pattern of racketeering activity" distinct from the Enterprise that meets the requirements of New Jersey's RICO statute.  Likewise, Plaintiffs have adequately alleged a "conspiracy" in violation of the New Jersey RICO statute.  As to Section 10(b) of the Exchange Act and common law fraud, only PwC challenges Plaintiffs' claims, and only on the basis that Plaintiffs have not adequately pled scienter.  As demonstrated below, however, Plaintiffs have met the requisite pleading threshold: PwC ignored red flag after red flag about

3

Valeant's suspicious relationship with Philidor and had extensive access to Philidor's books during its audit.  Despite all this knowledge, PwC made a knowing or reckless decision to conceal Philidor's relationship with Valeant – a decision that resulted in an accounting restatement due to the startling and now admitted violations of GAAP and GAAS.  With respect to Section 18 of the Exchange Act, Plaintiffs' claims are timely: the class action tolled the statute of limitations for those claims and Defendants have been on notice of the claims because they share a common factual predicate.

Finally, Plaintiffs have adequately alleged claims under New Jersey common law.  As to the aiding and abetting claim, Plaintiffs have adequately alleged that PwC and the Valeant Defendants each had knowledge of Valeant's fraud and participated in it by virtue of their prescribed roles in the Valeant Enterprise.  Plaintiffs also have adequately alleged negligent misrepresentation by the Valeant Defendants and the Bank Offering Defendants who sold securities directly to the New York City Funds.  Contrary to Defendants' assertions, Plaintiffs' negligent misrepresentation claims are viable under New Jersey law.

For the reasons set forth below, the Court should deny Defendants' partial motions to dismiss.

## STATEMENT OF FACTS

By now the Court is familiar with the facts at issue in this litigation, and thus Plaintiffs will only recount the facts most relevant to determination of the pending motions to dismiss.

## I.   PARTICIPANTS IN THE VALEANT ENTERPRISE

Valeant is a Canadian pharmaceutical and medical device company headquartered in Bridgewater, New Jersey.  ¶ 19.[2]  Between 2008 and 2015, Valeant acquired several drug companies, aiming to develop a drug portfolio with minimal competitive exposure and a sales

---

[2] Citations in the form "¶ __" are to the Complaint.

channel through which those drugs could be insulated from competitive pressure. ¶¶ 30-31, 68-69. The Company sharply and repeatedly raised the prices of its newly acquired portfolio of drugs through a strategy known as "alternative fulfillment" ("AF"), which enabled the Valeant Enterprise to funnel sales of its exorbitantly priced drugs through its secret network of pharmacies developed to avoid generic competition. ¶¶ 71-87. The Valeant Defendants placed employees at Philidor, who ensured that Philidor would avoid generic competition by engaging in various fraudulent sales practices. ¶¶ 4, 84-85. And Valeant benefited from all this by touting its growth to investors like the New York City Funds while concealing the true engine of that growth, namely the illegal sales practices conducted through a secret network of pharmacies. ¶¶ 133-291.

PwC had access to Valeant and Philidor's books and worked as Valeant's outside auditor. ¶ 60. As further described below, PwC knowingly or recklessly issued a 2014 audit opinion that accompanied Valeant's 2014 10-K (the "2014 Audit Report"), and certified materially false and misleading financial statements which allowed the Valeant Enterprise to conceal its illegal activities and enabled Defendants to sell debt securities to continue funding Valeant's acquisition spree. ¶¶ 60-63, 234.

Pearson was Valeant's chief executive officer from February 2008 until May 2016. ¶¶ 33, 333. He was one of the principal architects of the Valeant Enterprise, including its acquisition and price-gouging strategies and led the effort to put those strategies into practice through Philidor's pharmacy network. ¶¶ 33-36. Pearson worked diligently to cloak the Valeant Enterprise in a veil of secrecy, repeatedly misrepresenting the true sources of Valeant's revenue growth during public earnings calls and investor conferences, and signing quarterly and annual financial statements, as well as Sarbanes-Oxley certifications ("SOX certifications") attesting to

the accuracy of Valeant's financials and the effectiveness of its internal controls, all of which Pearson knew were false and all of which allowed the price of Valeant securities to be artificially inflated during the Relevant Period.  *Id.*[3]

Schiller was Valeant's chief financial officer from December 2011 until June 2015.  ¶ 37. He was closely involved in the planning and execution of every aspect of the Valeant Enterprise, including directly sanctioning illegal AF sales practices, actively working to conceal the relationship between Valeant and Philidor, and falsifying Valeant's financial statements.  ¶¶ 36-39.  Like Pearson, he signed the Company's quarterly and annual financial statements and SOX certifications during his tenure.  ¶ 38.  In March 2016, Valeant admitted that Schiller had engaged in "improper conduct" that "contributed to the misstatement of [financial] results" and led to Valeant's restatement of its financial statements for fiscal year 2014 and for the first quarter of 2015.  ¶ 39.

Rosiello was Valeant's chief financial officer from July 2015 until December 2016.  ¶ 22. He knowingly deceived investors about the true sources of Valeant's revenue growth and its relationship with Philidor and supervised the preparation of materially inaccurate financial statements.  ¶ 40.

Carro was Valeant's Controller and a participant in the Valeant Enterprise.  ¶ 23.  She authorized and worked to implement Valeant's aggressive acquisition and price-gouging strategies, directed astronomical price increases, and supervised the preparation of materially inaccurate financial statements.  ¶ 41.

Barclays and Deutsche Bank, finally, were investment banks that sold Valeant debt securities to Plaintiffs.  ¶¶ 26-27.

---

[3] The "Relevant Period" is January 3, 2013 through March 14, 2016.

## II.      THE VALEANT ENTERPRISE AND FRAUDULENT SCHEME

### A.      Valeant's Deceptive Business Model

Valeant acquired more than 100 pharmaceutical companies between 2008 and 2014.  ¶ 68.  Through those acquisitions, it developed a portfolio of drugs that cater to a small population, and thus face little competition, while also focusing on market sectors with minimal competition from other pharmaceutical firms.  ¶¶ 69-70.  Pearson, working closely with other top executives, developed and executed a plan to spike the prices of its newly acquired drugs.  ¶¶ 71-78.  Indeed, in 2015, Valeant raised its brand name drug prices at an average rate of 66%, a rate more than five times greater than its competitors.  ¶ 79.

Valeant took careful steps to eliminate cost control mechanisms and sell its drugs at inordinate, supra-competitive prices throughout its secret distribution network of pharmacies, many of which it named after chess players and chess strategies.  ¶¶ 81-82.  Notably, Valeant's chief compliance officer, Seana Carson, expressed concerns about Gary Tanner, a Valeant employee who was not only working from Philidor's offices, but managing Philidor's operations and employees, all while working under the alias "Brian Wilson" to conceal his dual role.  ¶¶ 84-87.  Pearson and Schiller refused to acknowledge Carson's concerns, knowing the value of their AF strategy.  *Id.*

The Valeant Enterprise consisted of an intricate network of shell companies, also named for chess players and chess strategies, to cover up its ownership interests in pharmacies around the country and dupe payors into reimbursing Valeant for drugs that should have been substituted for generics or should not have been filed at all.  ¶¶ 96, 105.  The Valeant Enterprise left this labyrinthine collection of shell companies and pharmacies a secret to create the illusion that the pharmacies were operating independently, which discouraged patients, hospitals, and insurers from closely scrutinizing the outrageous prices of Valeant's drugs.  ¶ 105.

On December 15, 2014, Valeant acquired a ten-year option to purchase the pharmacy Philidor for $0 (the "Philidor Option"), with an additional $133 million in incentive-based payments which could be triggered if Philidor satisfied certain performance benchmarks. ¶¶ 106; 127.  The Philidor Option was surreptitiously routed through a Valeant subsidiary, KGA Fulfillment Services ("King's Gambit Accepted," another chess name), and the transaction itself was structured as an option to conceal Valeant's ownership interest in, and formal assumption of control over, Philidor.  ¶¶ 107-08.  The purchase agreement provided that Valeant would enter additional agreements with other shell companies with chess-themed names, in yet another example of subterfuge calculated to obscure the true nature and extent of the Valeant-Philidor relationship.  ¶¶ 107-09.

### B.    PwC's Concealment of Valeant's Relationship with Philidor and Violation of Core Accounting Rules

PwC's knowledge of Valeant's relationship with Philidor was thorough and wide-ranging.  PwC was both Philidor's auditor and Valeant's auditor, and collected information from both in that capacity.  ¶¶ 25, 232.  PwC knew about the $100 million Option to purchase Philidor, ¶ 60, including the additional $133 million in milestone payments for which Philidor was eligible under the Option, ¶ 127.  PwC knew that Valeant's business involved the acquisition of drug makers and not typically pharmacies.  *Id.*  It knew that the Philidor Option was a one-time transaction unlike any other transaction in which Valeant was involved.  *Id.*  PwC knew that Philidor was a substantial part of Valeant's business, comprising, for example, $111 million in sales of Valeant-only products through Philidor in 2014.  ¶ 129.  Against this extensive knowledge, PwC blessed the decision not to disclose Philidor's relationship with Valeant while also booking Philidor's business within Valeant's business.  ¶¶ 60, 124.

Ultimately, PwC certified in Valeant's 2014 10-K: that Valeant's financial statements

8

complied with GAAP, ¶¶ 123-32; that Valeant's financial statements were audited in accordance with GAAS, *id.*; that Valeant had effective internal controls over financial reporting, ¶ 123; and that PwC's audit of Valeant complied with PCAOB standards, *id.*; ¶ 231.  PwC did so notwithstanding its direct knowledge of Valeant's relationship with Philidor and its "day-to-day" communication with Philidor.  ¶ 232.  Each of PwC's representations was false when made, as Valeant admitted in its restatement that its 2014 financial statements violated GAAP, vastly overstated Valeant's revenues, income, and earnings per share, and falsely reported that Valeant's internal controls were adequate.  ¶ 62; 198-212.  For its services, PwC was paid audit fees of $13.4 million, $12.6 million, and $20.5 million by Valeant in 2013, 2014, and 2015, respectively.  ¶ 230.

### C.   Misrepresentations in Furtherance of the Scheme

Defendants made numerous misrepresentations in which they linked Valeant's revenue growth to increased drug sales to obscure the true source of growth – namely massive increases in drug prices achieved by stamping out generic competition through various "back door" approaches – through a series of conference calls with investors, press releases, financial statements, and at a healthcare conference.  ¶¶ 134 at 50, 136-76 at 53-67.  They also made numerous misrepresentations calculated to enshroud the links among Valeant, Philidor, and the array of related pharmacies and shell companies in secrecy.  ¶¶ 177-97.

Furthermore, Valeant made numerous misrepresentations, including those made in its financial statements, that its accounting practices accorded with GAAP.  ¶¶ 213-20.  Pearson, Schiller, and Rosiello also repeatedly and falsely attested to the integrity of Valeant's internal controls in the Company's financial statements.  ¶¶ 221-29.  Ultimately, PwC's audit opinion certifying the accuracy of Valeant's financial statements and the integrity of the Company's internal controls was materially false, misleading, and aimed at concealing the Valeant-Philidor

relationship, the extent to which drug price increases were driving Valeant's revenue growth, and other material aspects of Valeant's business.  ¶¶ 123-32, 230-34.  As Valeant later admitted in issuing its restatement, it materially overstated its revenue in 2014 and 2015.  ¶¶ 198-212.

The Bank Offering Defendants also made false and misleading statements to investors. In selling Valeant debt securities directly to the New York City Funds, Barclays represented in offering documents that, among other things, Valeant was not a party to significant acquisitions and that its business strategy was a "lower-risk, output-focused research and development model[.]"  ¶¶ 288-89.  Likewise, Deutsche Bank represented to Plaintiffs that Valeant focused on "durable products [with] potential for sustainable organic growth" and that Valeant products were distributed by third parties it did not control.  ¶¶ 290-91.  These misrepresentations, too, induced Plaintiffs to purchase Valeant's debt securities, ¶¶ 287-88, and Barclays and Deutsche Bank each had special reason to believe they were false and misleading: Barclays served as Valeant's financial advisor in its $47.5 billion offer for Allergan, giving it intimate familiarity with Valeant's business model, how Allergan would have fit into that model, and the merits of the arguments Allergan made against Valeant, ¶¶ 151, 152, 443; and Deutsche Bank was Medicis' financial advisor when Valeant bought it, which similarly gave Deutsche Bank intimate familiarity with the reason why Valeant acquired Medicis – the AF program that became the launch pad for Philidor.  ¶¶ 443, 83, 179, 180.

## III.   REVELATION OF THE VALEANT ENTERPRISE AND FRAUDULENT SCHEME

Beginning in the fall of 2015 and continuing through June 2016, elements of the truth about Valeant's business began to come to light through a series of news and other public reports.  ¶¶ 235-79.  These revelations prompted Defendants to engage in an intensive and concerted campaign of misinformation to preserve the criminal scheme.  *Id.*  In response to a

Bloomberg report of an impending Congressional investigation into Valeant's price-gouging practices, for example, Defendants filed a Form 8-K with the U.S. Securities and Exchange Commission ("SEC") that maintained that Valeant's growth was "not dependent on price increases." ¶¶ 236-38. And in response to an onslaught of additional revelations in the wake of the Bloomberg report, Valeant continued its campaign of public deceit, insisting that its operations were fully compliant with the law, that its use of specialty pharmacies was typical of the pharmaceutical business, that Philidor did not restrict prescriptions to any particular drug manufacturer, that Valeant achieved no sales benefit from inventory held in its network of pharmacies, and that Valeant had not double-booked revenue for Philidor-related sales. ¶¶ 240-55.

In October 2015, Valeant held a conference call with an accompanying presentation by Pearson, Schiller, Rosiello, and Carro. The presentation falsely maintained that Valeant did not control Philidor; Pearson falsely represented that Valeant's accounting treatment of Philidor was appropriate; Rosiello falsely asserted that Valeant's revenue recognition with respect to Philidor was above board; and Carro insisted that Philidor was not material to Valeant's business and defended its omission from Valeant's financial disclosures. ¶¶ 258-60. In response to further revelations, Pearson insisted that Valeant's relationship with Philidor grew out of a desire to "deliver better, faster customer service for doctors and patients" and denied that there was any financial fraud related to Valeant's dealings with Philidor. ¶¶ 268-72. In short, Defendants persisted in actively misrepresenting the relationship between Valeant and Philidor as the revelations mounted, claiming to be investigating the relationship and appearing to learn facts about the Philidor-Valeant relationship for the first time, when in truth they were the authors of the Philidor Option and had known first-hand the degree of control Valeant enjoyed over

11

Philidor from the outset.  ¶¶ 308-10.

Ultimately, Valeant announced that it would terminate its relationship with Philidor,  ¶ 266; both houses of Congress launched investigations into the Company's AF strategy, ¶¶ 267, 275; the U.S. Attorneys for the District of Massachusetts and the Southern District of New York, among other government officials, initiated investigations, ¶ 241; analysts and ratings agencies sharply criticized and downgraded the Company, ¶¶ 209-11, 279-81, 283; and Valeant restated certain of its financial statements, admitting they were materially false and that the Company's disclosure controls and internal controls over financial reporting were inadequate, ¶ 285. Valeant remains a focus of investigations by Congress, the SEC, and the states of Texas and North Carolina, and a criminal probe by the U.S. Department of Justice.  ¶ 11.

As the truth leaked out, the prices of Valeant's common stock and debt securities fell from a high of over $262 per share on August 5, 2015 to less than $15 on August 19, 2016, a decline of more than 90%.  ¶ 12.

## ARGUMENT

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Kedra v. Schroeter*, 876 F.3d 424, 440-41 (3d Cir. 2017) (citing *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).  Although "[f]actual allegations must be enough to raise a right to relief above the speculative level," Plaintiffs must allege "only enough facts to state a claim to relief that is plausible on its face" and need not engage in "heightened fact pleading of specifics."  *Id.* at 441 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).  All that is required is that Plaintiffs "nudge[]" their claims "across the line from conceivable to plausible."  *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679-80 (2009)).

Additionally, with respect to allegations of scienter, "courts must consider the complaint in its entirety." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The question "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23.

## I.    THE COMPLAINT ADEQUATELY ALLEGES VIOLATIONS OF THE NEW JERSEY RICO ACT

Plaintiffs have adequately alleged that the Valeant Defendants and PwC, in violation of the New Jersey RICO statute, N.J. Stat. Ann. § 2C:41-2(c), were each persons or entities (1) who were employed by or associated with an enterprise; (2) engaged in or the activities of which affect trade or commerce[4]; (3) who conducted or participated, directly or indirectly, in the enterprise's affairs; (4) through a pattern – *i.e.*, at least two incidents – of racketeering activity, N.J. Stat. Ann. § 2C:41-1(d)(1); (5) and caused damages to Plaintiffs thereby. Plaintiffs have also adequately alleged that the Valeant Defendants and PwC conspired to violate this provision, in violation of N.J. Stat. Ann. § 2C:41-2(d). Notably, the New Jersey RICO statute explicitly states that it is to be "liberally construed to effectuate [its] remedial purposes." N.J. Stat. Ann. § 2C:41-6, N.J. Stat. Ann. § 2C:41-6(1).

### A.    Plaintiffs Adequately Allege Primary Violations of the New Jersey RICO Act
#### 1.    Plaintiffs Adequately Allege an "Enterprise"

The Valeant Defendants and PwC argue, first, that the alleged "enterprise" and the alleged "pattern of racketeering activity" must be distinct, and that the New York City Funds have improperly conflated the two elements. Valeant Br. at 8-12; PwC Br. at 18-21. Second, they argue that Plaintiffs have failed to identify the structure of the alleged enterprise. Valeant

---

[4] None of the Defendants challenge Plaintiffs' allegation that the alleged enterprise affected trade or commerce.

13

Br. at 12-13; PwC Br. at 17-21.  Both arguments stretch the statutory language beyond what Plaintiffs are required to allege or prove.  "[A]ll that is required to satisfy the New Jersey RICO enterprise element is a group of people, *however loosely associated*, whose existence provides the common purpose of committing two or more predicate acts."  *State v. Ball*, 632 A.2d 1222, 1240 (App. Div. 1993) ("*Ball I*"), *aff'd*, 141 N.J. 142 (1995) ("*Ball II*") (emphasis added).[5]

### a. Plaintiffs Allege a Distinct Enterprise and Pattern of Racketeering Activity

Defendants argue that the Complaint improperly conflates the enterprise and racketeering activity elements and fails to allege the Valeant Enterprise as sufficiently distinct from its racketeering activity.  Valeant Br. at 9 (citing *Ball II*, 141 N.J. at 161-62).

This argument is wrong on both the facts and the law.  On the facts, the Complaint describes in 166 pages of detail how the Valeant Enterprise had a purpose and structure distinct from the racketeering in which it was engaged.  Its purpose was to engineer its AF program to enable Valeant's price gouging, ¶¶ 31-32, 71-80, and the mechanisms it used to achieve those purposes were distinct and encompassed racketeering: creating a network of secret captive pharmacies by lying to state pharmacy regulators, ¶¶ 3, 97-98, 101-03; deceptive and illegal practices in filling prescriptions and then seeking reimbursements from insurers and other third-party payors, ¶¶ 88-95; misleading patients, doctors, insurers, and payors to ensure sales and reimbursement of price-gouged brand-name Valeant drugs, ¶¶ 96-105; promoting a misleading image of Valeant as a high-organic-growth drug manufacturer to investors, ¶¶ 136-76 at 53-67; committing accounting fraud and other violations of GAAP and GAAS to conceal Valeant's

---

[5] "[T]he focus of the evidence must be on the number of people involved and their knowledge of the objectives of their association, how the participants associated with each other, whether the participants each performed discrete roles in carrying out the scheme, the level of planning involved, how decisions were made, the coordination involved in implementing decisions, and how frequently the group engaged in incidents or committed acts of racketeering activity, and the length of time between them."  *Ball II*, 141 N.J. at 162-63.

relationship with Philidor and the rest of the pharmacy distribution network, ¶¶ 123-32, 378; and continuing to misrepresent the nature of Valeant's business model, its operations, and its prospects even as a series of public revelations threatened to expose the truth behind the scheme, all in an effort to induce additional investments which it used to fund acquisitions of yet more companies so that it could repeat the entire process again, ¶¶ 235-86.  Accordingly, Defendants' premise, *i.e.*, that Plaintiffs have pled that the alleged "enterprise" is equivalent to the alleged racketeering activity, is simply untrue.  The alleged enterprise in fact goes far beyond the alleged racketeering activity.

The facts alleged here illustrate a far more comprehensive "enterprise" distinct from "racketeering activity" than in the cases Defendants cite.  *See* Valeant Br. at 10.  In *300 Broadway v. Martin Friedman Assocs., P.C.*, No. 08-5514 (KSH), 2009 WL 3297558, at *6 (D.N.J. Oct. 13, 2009), the plaintiffs alleged only that the participants in the enterprise shared a common goal of engaging in racketeering activity; there was "no other identity or characteristic attributed to the [e]nterprise."  *Id.*  Likewise, in *Galicki v. New Jersey*, No. 14-169 (JLL), 2016 WL 4950995, at *26 n.28 (D.N.J. Sept. 15, 2016), the plaintiffs attempted to base a RICO claim on an "isolated, one-off event" – not the continuing series of different types of activities Plaintiffs allege here.  *Id.* at *26.  Contrary to the plaintiffs in *Dare Invs., LLC v. Chicago Title Ins. Co.*, No. 10-6088 (DRD), 2011 WL 2600594, at *9 (D.N.J. June 29, 2011), moreover, Plaintiffs have alleged an extensive structure and organization separate and apart from misrepresentations in the Company's financial statements.  *See* Section I.a.1.b, *infra*.  Similarly, in *Parrino v. Swift*, No. 06-0537 (DRD-SDW), 2006 WL 1722585, at *2-3 (D.N.J. June 19, 2006), the plaintiffs pled nothing more than the conclusory allegation that the "association was an 'enterprise.'"  *Id.*  And in *Hollis-Arrington v. PHH Mortg. Corp.*, No. 05-2556 (FLW), 2005

15

WL 3077853, at *8 (D.N.J. Nov. 15, 2005), the "sole reason for the existence of the Enterprise" was the alleged fraud.  *Id.*  Here, the Valeant Enterprise is alleged to have allowed Defendants to illegally fuel its AF program through numerous types of racketeering acts.  This distinction between the enterprise and racketeering is more than sufficient to meet the statutory requirement.

Defendants compound their error by misreading New Jersey law.  The enterprise and the pattern of racketeering activity elements are distinct elements.  *See Ball II*, 141 N.J. at 161-62 ("[U]nder the RICO Act "enterprise" is an element separate from the "pattern of racketeering activity[.]").  That is unremarkable.  But *the proof* for those elements is not necessarily distinct: "evidence that serves to establish such an enterprise need not be distinct or different from the proof that establishes the pattern of racketeering activity."  *Id.* at 162; *see also id.* at 160 (acknowledging holding in *Ball I* that "the 'enterprise' element is satisfied if the 'enterprise' is no more than the sum of the racketeering acts") (quoting *Ball I*, 632 A.2d at 1259).

Defendants push hard to rewrite state law, but New Jersey courts have decided this issue.  Thus, the cases Defendants cite – in which courts were construing the *federal* RICO statute, not the *New Jersey* RICO statute – are not persuasive.  The Court may also make quick work of Defendants' spin that the federal statute and New Jersey statute are co-extensive.  Valeant Br. at 10 n.7.  They are not.  The court in *Ball I* held that "the New Jersey Legislature intended its RICO statute to be even broader in scope than the federal act," *Ball II*, 141 N.J. at 167 (citing *Ball I*, 632 A.2d at 1240),[6] a principle this Court has soundly and previously acknowledged.  *See*

_____

[6] The *Ball II* court approvingly noted the *Ball I* court's admonition that the New Jersey RICO statute is broader than the federal RICO statute in the course of holding that, in certain instances, the New Jersey RICO statute must be interpreted differently than the federal RICO statute.  *See Ball II*, 141 N.J. at 163-69.  Specifically, the *Ball II* court wrote that the New Jersey statute does not require proof of "'continuity' as a distinctive sub-element of 'pattern [of racketeering activity].'"  *Id.* at 168.  Federal law, by contrast, conceives of continuity as a "distinct prong[]" of the "pattern of racketeering" element.  *Id.* at 164.

*Joaquin v. Lonstein Law Office, P.C.*, No. 15-8194 (MAS) (DEA), 2017 WL 2784708, at *2 (D.N.J. June 27, 2017) (Shipp, J.) (noting the "more liberal construction [of NJ RICO] under New Jersey law").[7]  That the New Jersey RICO statute includes securities fraud as a predicate act, while the federal RICO statute does not, underscores that the statutes are different.  *See Fagan*, 2016 WL 347318, at *13 (noting that "unlike its federal counterpart, the New Jersey RICO statute includes securities fraud as a predicate act").

The remaining cases Defendants cite, namely *Cetel v. Kirwan Fin. Group, Inc.*, 460 F.3d 494, 510 (3d Cir. 2006), and *Prudential Ins. Co. of Am. v. Bank of Am., Nat'l Ass'n*, 14 F. Supp. 3d 591, 613 (D.N.J. 2014), are confined to their unique contexts.  In *Cetel*, the court, looking to parallel federal case law for guidance, applied the federal four-year statute of limitations to New Jersey RICO claims rather than the state six-year statute of limitations.  460 F.3d at 510.[8]

---

[7] *See also In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 532 (S.D.N.Y. 2011) (Rakoff, J.) ("[T]he New Jersey courts have determined that NJRICO is broader than its federal counterpart in defining 'enterprise.'"); *Fagan v. Fischer*, No. 14-7013 (FLW)(TJB), 2016 WL 347318, at *13 (D.N.J. Jan. 28, 2016) ("New Jersey RICO is broader in scope and is construed more liberally than the federal RICO Act."); *Prudential Ins. Co. of Am. v. Credit Suisse Sec. (USA) LLC*, No. 12-7242 (KSH), 2013 WL 5467093, at *20 (D.N.J. Sept. 30, 2013) (quoting *State v. Bisaccia*, 724 A.2d 836 (App. Div. 1999)) ("While closely related to its federal counterpart, the NJRICO statute is construed more broadly."); *Slimm v. Bank of Am. Corp.*, No. 12-5846 (NLH/JS), 2013 WL 1867035, at *19 (D.N.J. May 2, 2013) (quoting *Ford Motor Co. v. Edgewood Props., Inc.*, No. 06-1278, 2009 WL 150951, at *10 (D.N.J. Jan. 20, 2009)) ("[I]n certain aspects, the New Jersey RICO statute is broader in scope than the federal statute[.]"); *Prudential Ins. Co. of Am. v. Goldman, Sachs & Co.*, No. 12-6590 (SDW)(MCA), 2013 WL 1431680, at *10 (D.N.J. Apr. 9, 2013) ("New Jersey broadly construes the 'enterprise' element [of NJRICO], unlike the federal statutory counterpart.").

[8] Courts have held that where, as in *Cetel*, the federal RICO statute and New Jersey RICO statute are in accord, it may be appropriate to seek guidance from federal decisions to interpret the latter.  *See Fimbel v. Fimbel Door Corp.*, No. 14-1915 (FLW)(DEA), 2014 WL 6992004, at *5 n.9 (D.N.J. Dec. 10, 2014) (noting that "[w]hile the New Jersey Supreme Court acknowledged in *Ball* that NJRICO departs materially in certain respects from the federal RICO act that served as a model for the state law, the *Ball* court cited several federal RICO cases in its interpretive analysis when appropriate, as the Court will do here"); *Royale Luau Resort, LLC v. Kennedy Funding, Inc.*, No. 07-1342 (HAA), 2008 WL 482327, at *6 (D.N.J. Feb. 19, 2008) (noting that "the *Ball* court relied on federal cases in interpreting the NJRICO Act, and this Court will do the

Similarly, in *Prudential*, the court followed federal jurisprudence and held that a corporation could not conduct an "enterprise" within the meaning of New Jersey's RICO statute by associating with its wholly-owned subsidiary.  14 F. Supp. 3d at 616.  The law is clear that, although Plaintiffs here have pled far more, "an enterprise may be pleaded as 'no more than the sum of the racketeering acts.'"  *Ford Motor Co. v. Edgewood Props., Inc.*, No. 06-1278, 2009 WL 150951, at *11 (D.N.J. Jan. 20, 2009)[9] (quoting *Shan Indus., LLC v. Tyco Int'l (US) Inc.*, No. 04-1018 (HAA), 2005 U.S. Dist. LEXIS 37983, at *49 (D.N.J. Sept. 12, 2005)); *see also Fairfax Fin. Holdings Ltd. v. S.A.C. Capital Mgmt., L.L.C.*, 160 A.3d 44, 67 (App. Div. 2017) (same).

### b.  Plaintiffs Adequately Allege the Division of Functions Within the Enterprise

The specific roles described in the Complaint allege the division of functions aimed at achieving a common purpose within the Valeant Enterprise through a high degree of coordination and careful planning.  Yet, Defendants contend the allegations are insufficient because a RICO enterprise must have a particular structure.  Valeant Br. at 12-13.  Even if Plaintiffs had not offered such robust detail, however, and contrary to Defendants' view, an enterprise "need not feature an ascertainable structure or a structure with a particular configuration[]" under New Jersey's RICO statute.  *Ball II*, 141 N.J. at 162.  Rather, an organization marked by coordination and division of labor is sufficient.

*Ball II* holds that a RICO enterprise:

---

same in appropriate circumstances, and where those federal cases do not conflict with any idiosyncracies of the New Jersey statute"); *Maxim Sewerage Corp. v. Monmouth Ridings*, 640 A.2d 1216, 1219 (N.J. Super. Ct. Law. Div. 1993) (noting that "[e]xcept where inconsistent with *Ball*, New Jersey will still look to federal decisions interpreting RICO . . . to interpret the state offense").

[9] *Modified on other grounds on reconsideration*, No. 06-1278 (HAA)(ES), 2009 WL 2488174 (D.N.J. Aug. 11, 2009).

> must have an "organization." . . . The hallmark of an enterprise's organization consists . . . in those kinds of interactions that become necessary when a group, to accomplish its goal, divides among its members the tasks that are necessary to achieve a common purpose.  The division of labor and the separation of functions undertaken by the participants serve as the distinguishing marks of the "enterprise" because when a group does so divide and assemble its labors in order to accomplish its criminal purposes, it must necessarily engage in a high degree of planning, cooperation and coordination, and thus, in effect, constitute itself as an "organization."

*Ball II*, 141 N.J. at 162 (emphasis added); *see Ford Motor Co.*, 2009 WL 150951, at \*11 ("enterprise may . . . be identified by the existence of an ascertainable structure, such as that which exists within a corporation, or by an informal organization which demonstrates a division of labor").

Here, the Complaint painstakingly identifies the members of the alleged Valeant Enterprise and the particular roles that each member assumed while working toward the objectives of the Enterprise.  *See* ¶¶ 29-65.  Those allegations demonstrate that the Enterprise was an organization with a structure that supported planned and coordinated activities among its members.  In particular:[10]

- Valeant aggressively acquired pharmaceutical companies and pharmacies, funneled the acquired products through Valeant's AF channel led by Philidor (composed of a network of captive pharmacies named after chess players and chess strategies), and thereby engaged in abusive sales tactics and price hikes to avoid generic competition.  Valeant also made false and misleading representations in its public financial statements to support the purposes of the Enterprise and help fund the acquisition of additional pharmaceutical companies, ¶¶ 30-32, 82, 96;

- PwC, in its capacity as Valeant's outside auditor, certified Valeant's fictitious accounting and enabled the concealment of the relationship between Valeant and Philidor to support the purposes of the Enterprise, particularly in issuing debt to continue to induce investment, despite the existence of multiple red flags that

---

[10] Others, not named as defendants, were also members of the Enterprise, including Gary Tanner, Andrew Davenport, and Matthew Davenport.  *¶¶* 42-49; 54-56.

militated against such an endorsement and despite having access to Philidor's books, and thereby intentionally or recklessly made misrepresentations in its 2014 Audit Report that concealed the true nature of Valeant's relationship with Philidor, ¶¶ 60-63, 128;

- Pearson, in his capacity as Valeant's CEO, spearheaded Valeant's acquisition spree, and developed Valeant's AF program and price-gouging strategies to drive Valeant's inorganic and unsustainable revenue growth. He coordinated with top executives to determine how much to raise drug prices. Pearson also issued statements to mislead Valeant's investors so that they would support the purposes of the Enterprise, ¶¶ 33-36, 73;

- Schiller, in his capacity as Valeant's CFO from 2011-2015, worked within the Valeant Enterprise to conceal the relationship between Valeant and Philidor from investors and instead enabled Valeant to report inflated revenue and net income to artificially inflate the price of Valeant's securities and support the purposes of the Enterprise, ¶¶ 37-39;

- Rosiello, in his capacity as Valeant's CFO from 2015-2016, participated in Valeant's inorganic growth-by-acquisition practice as well as oversaw its AF program that called for price gouging and abusive sales tactics. Moreover, Rosiello oversaw the preparation and publication of inaccurate financial statements, and made false representations to investors about the drivers of Valeant's revenue growth and about Valeant's relationship with Philidor to support the purposes of the Enterprise, ¶ 40; and

- Carro, in her capacity as Valeant's Controller, directly authorized Valeant's illegal and abusive sales fulfillment practices, coordinated massive price increases of certain drugs, and oversaw the preparation of false and misleading financial statements to support the purposes of the Enterprise, ¶ 41.

These allegations easily meet the standard of demonstrating a division of functions. They reflect that Defendants' efforts were highly coordinated and planned to support the common purpose of the Valeant Enterprise. Indeed, Plaintiffs have gone beyond the relevant pleading standard – they need not have alleged such specificity with respect to the roles within the Valeant Enterprise.

The cases Defendants rely upon to assert Plaintiffs should be held to a higher pleading standard are inapposite because, as above, Plaintiffs' claims arise under New Jersey's RICO statute, which has a broader conception of "enterprise" than the federal RICO statute. *State v.*

20

*Cagno*, 211 N.J. 488, 494 (2012) ("a RICO enterprise need not have a defined organization, structure, or leadership"); *State v. Motley*, No. A-0406-04T4, 2006 WL 848296, at *9 (App. Div. Apr. 3, 2006) ("The organization of an enterprise need not feature an ascertainable structure or a structure with a particular configuration."); *Fairfax Fin. Holdings Ltd. v. S.A.C. Capital Mgmt., L.L.C.*, 160 A.3d 44, 39 (App. Div. 2017) (an enterprise need not have a "definable structure").

Defendants' cases are also distinguishable on their facts.  For example, Defendants first cite *Galicki*, 2016 WL 4950995, at *26, *reconsideration denied*, No. CV 14-169 (JLL), 2016 WL 7494257 (D.N.J. Dec. 1, 2016).  While assessing the RICO claims in *Galicki*, the court wrote that "it defies commonsense to view the [alleged criminal conduct]—including the planning stages and the fallout—as anything other than an isolated, one-off event that, once uncovered, had no risk of continuing."  *Id.*  The court accordingly dismissed the plaintiffs' RICO claims with prejudice.  *See id.*  The markedly different facts of this case, with its allegations of a systematic campaign of criminal conduct spanning many years, underscore the irrelevance of *Galicki* to the question of whether a RICO enterprise is present here.  Likewise, Defendants cite *In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 533-34 (S.D.N.Y. 2011), as support for the notion that Plaintiffs have not adequately alleged a separation of functions within the enterprise. *Refco* is readily distinguishable, however, as the *Refco* court concluded: "In short there is *nothing* in the Amended Complaint to indicate that the members of the alleged enterprise actually operated as a group."  *Id.* (emphasis added).  Here, by contrast, Plaintiffs' allegations are replete with evidence of highly coordinated activity.

Accordingly, Plaintiffs' allegations of an "enterprise" are more than sufficient to withstand a motion to dismiss.

### 2.    Plaintiffs Adequately Allege Racketeering Activity

Valeant, Rosiello, and Pearson concede their participation in racketeering activity has

been adequately pled, leaving only Carro, Schiller, and PwC to contest Plaintiffs' alleged RICO claims on this basis.  Valeant and Rosiello, however (together with Pearson who joins their brief), do argue that the New Jersey RICO statute was not designed to address securities fraud.  Their position is directly contradicted by the text of the statute itself, and plainly wrong.

### a.  Securities Fraud Is a Predicate Act Under New Jersey's RICO Statute

Valeant, Rosiello, and Pearson argue that Plaintiffs impermissibly "convert securities claims into RICO claims."  Valeant Br. at 7-8.[11]  This argument misstates the law.  Unlike the federal RICO statute, the New Jersey RICO statute explicitly enumerates "fraud in the offering, sale or purchase of securities" within the definition of "racketeering activity."  N.J. Stat. Ann. § 2C:41-1(a)(1)(p).

Although the Private Securities Litigation Reform Act ("PSLRA") provides that securities fraud is not a predicate act under the federal RICO statute, New Jersey's RICO statute has no such restriction.  Tellingly, Defendants ignore a series of post-PSLRA decisions which confirm that New Jersey RICO permits claims predicated on securities fraud.  *See*, *e.g.*, *Prudential Ins. Co. of Am. v. Goldman, Sachs & Co.*, No. 12-6590 (SDW)(MCA), 2013 WL 1431680, at *10 (D.N.J. Apr. 9, 2013) (denying a motion to dismiss where plaintiffs alleged that defendants violated the New Jersey Uniform Securities Law as a predicate act to a New Jersey RICO violation); *In re Tyco Int'l, Ltd.*, No. MDL 02-1335-B, 2007 WL 1703023, at *15 (D.N.H. June 11, 2007) (denying a motion to dismiss where plaintiffs alleged that defendants committed securities fraud as the predicate act to a New Jersey RICO violation); *Capitol First Corp. v. Todd*, No. 04-6439 (MLC), 2006 WL 3827329, at *15 (D.N.J. Dec. 27, 2006) (upholding a complaint that alleged, as part of a pattern of racketeering activity, violations of the New Jersey

---

[11] Carro, by contrast, acknowledges that in New Jersey racketeering conduct includes securities fraud.  Carro Br. at 2, 4.

securities statute); *Metz v. United Ctys. Bancorp.*, 61 F. Supp. 2d 364, 371-74 (D.N.J. 1999) (upholding a RICO complaint predicated on allegations of securities fraud, acknowledging the breadth of the New Jersey RICO statute, and noting that the court is "constrained by its deference to the New Jersey state legislature").

Valeant, Rosiello, and Pearson's position that the New Jersey RICO statute was not intended to address allegations of securities fraud ignores the statutory text and is thus baseless.

### b. Plaintiffs Adequately Allege a Pattern of Racketeering Activity as to PwC, Carro, and Schiller

Contrary to Defendants' assertions, Plaintiffs set forth facts sufficient to allege that PwC, Carro, and Schiller engaged in a "pattern of racketeering activity" within the meaning of New Jersey's RICO statute. Notably, under New Jersey's RICO statute, racketeering activity is defined to include a number of criminal acts, including not only securities fraud, but also fraudulent concealment of racketeering activity, mail fraud, and wire fraud. *See* N.J. Stat. Ann. § 2C:41-1. As described herein, the Complaint alleges that Defendants engaged in a combination of these, and that together they amount to a "pattern of racketeering activity" sufficient to withstand a motion to dismiss.

### i. PwC

PwC claims that "Plaintiffs allege only one act or incident by PwC—'that PwC provided an audit report on Valeant's 2014 financial statements.'" PwC Br. at 19 (quoting ¶ 230). PwC further asserts that "Plaintiffs have failed to allege that PwC's report was fraudulent[]" and thus does not constitute racketeering activity, and that in any event the report only constitutes one incident, and at least two are needed to show a pattern of racketeering activity. *Id.*

PwC's reading of the Complaint is selective, to say the least. Plaintiffs painstakingly detail how PwC's 2014 Audit Report contained multiple material misrepresentations of which PwC was, or should have been, aware. *See* ¶¶ 123, 125-28, and 230-33. These

23

misrepresentations include PwC's certification that Valeant's financial statements complied with GAAP and were audited in accordance with GAAS (misrepresentations that Valeant has since admitted); PwC's certification that Valeant's internal controls were effective (a misrepresentation Valeant has also since admitted); and PwC's certification that its audit complied with PCAOB standards. *See id.* Notably, PwC approved Valeant's decision not to disclose its relationship with Philidor and Valeant's improper double-booking of revenue for sales to Philidor in the fourth quarter of 2014. ¶¶ 124-25. Plaintiffs also allege that PwC violated Section 10(b) of the Exchange Act and Rule 10b-5 given its knowledge of, and reckless disregard for, its misrepresentations in the 2014 Audit Report. ¶¶ 397-403. Finally, and significantly, Plaintiffs allege that all Defendants, including PwC, committed numerous acts of mail and wire fraud each time PwC's certification was disseminated to investors. ¶¶ 381-83. Under New Jersey's RICO statute, a defendant need not personally mail or wire a communication – its transmission need only be reasonably foreseeable. *In re Ins. Brokerage Antitrust Litig.*, MDL No. 1663, 2017 WL 3642003, at *9 (D.N.J. Aug. 23, 2017). Where, as here, PwC transmitted misstatements via the mail and wire that it knew would be incorporated into Valeant's financial statements, it reasonably foresaw that those misstatements would be relied on by investors.

PwC also asserts that Plaintiffs' RICO claims are "implausible and conclusory" and that Plaintiffs have not alleged why PwC would have any financial interest in Valeant's success. PwC Br. at 16. Not so. PwC was paid audit fees of $13.4 million, $12.6 million, and $20.5 million for its services to Valeant in 2013, 2014, and 2015, respectively. ¶ 230. PwC had every incentive to maintain Valeant as a client, as Valeant was one of the largest pharmaceutical companies in the country. ¶ 19. *See Emcore Corp. v. PwC LLP*, 102 F. Supp. 2d 237, 265

24

(D.N.J. 2000) (rejecting a similar argument from PwC, and noting plaintiff's allegation that PwC was motivated to participate in an alleged RICO enterprise to retain a profitable client).

### ii. Carro

Carro maintains that Plaintiffs have alleged a single instance of securities fraud related to an October 26, 2015 conference call and otherwise merely allege "improper conduct."  Carro Br. at 5-7.  Yet Plaintiffs also specifically allege that Carro, in her capacity as Valeant's Corporate Controller, "directly authoriz[ed] the implementation of Philidor's illegal and unsustainable practices in the AF program," "orchestrat[ed] massive price increases of [drugs]," "overs[aw] the preparation of Valeant's false and misleading financial statements," and "participated in the drafting, preparation, and/or approval of the various SEC filings, releases, and other public statements identified[.]"  ¶¶ 41, 307.  The numerous misrepresentations contained in Valeant's public statements each constitute incidents of racketeering activity as they were issued, in part, to induce the purchase of securities.  Finally, Plaintiffs allege that all Defendants, including Carro, committed numerous acts of mail and wire fraud, including transmission of quarterly and annual financial statements and accompanying SOX certifications.  ¶¶ 381-83.

Carro also argues that "[a]llegations which lump Carro together with multiple Defendants and allege, for example, that they collectively 'participated in the drafting, preparation, and/or approval of the various SEC filings, releases, and other public statements,'" fail to meet the requirements of Rule 9(b).  Carro Br. at 8 (quoting ¶ 307).  Carro attempted a similar argument while seeking the dismissal of securities fraud claims against her, however, and this Court rejected it.  *See In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, No. 15-7658 (MAS) (LHG), 2017 U.S. Dist. LEXIS 66037, at *37-38 (D.N.J. Apr. 28, 2017), *reconsideration denied*, No. 15-7658 (MAS) (LHG), 2017 U.S. Dist. LEXIS 143232 (D.N.J. Sept. 5, 2017).  Carro argued previously that allegations that she had jointly distributed and presented materials that contained alleged

misstatements were insufficiently particular.  *Id.* at *37.  This Court disagreed, holding that the plaintiffs had met the standard articulated in *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011).  *Id.* at *38 (citing *In re Pfizer Inc. Sec. Litig.*, No. 04 Civ. 9866 (LTS)(HBP), 2012 U.S. Dist. LEXIS 39454, at *20 (S.D.N.Y. Mar. 22, 2012) (finding that the complaint "adequately allege[d] that the . . . [d]efendants [were] liable for statements issued in press releases, because they 'were involved in drafting, reviewing and/or disseminating the false and misleading financial statements that were issued. . . , approved or ratified these statements and, therefore, adopted them as their own")); *see also T. Rowe Price Growth Stock Fund, Inc. v. Valeant Pharms. Int'l, Inc.*, No. 16-5034 (MAS) (LHG), 2018 U.S. Dist. LEXIS 6134, at *19-20 (D.N.J. Jan. 12, 2018) (rejecting argument by Carro that she was not liable for statements in "group-published" documents, holding that this was a question of fact not suitable for resolution on a motion to dismiss).  Carro's argument that the Complaint is insufficiently particularized should be rejected here for the same reasons.

### iii. Schiller

Plaintiffs allege that Schiller "coordinated closely with senior Valeant and Philidor executives and was intimately involved in the planning, approval, direction, and monitoring of every aspect of the [fraudulent] scheme, including directly authorizing the implementation of illegal practices in Valeant's AF program."  ¶ 37.  Plaintiffs specifically enumerate a large number of false and misleading representations that Schiller made as a signatory to company financial statements and on company conference calls.  ¶¶ 37, 148, 162, 166, 167, 187, 192, 194, 222, 223, 225, 227, 228.  Thus, Schiller is alleged to have "facilitated the artificial inflation of the price of Valeant securities by, among other things, concealing the relationship between Valeant and Philidor by failing to disclose Philidor as a variable interest entity ("VIE") in Valeant's year-end financial statements."  ¶ 38.  Plaintiffs also allege that all Defendants,

including Schiller, committed numerous acts of mail and wire fraud, including transmission of quarterly and annual financial statements and accompanying SOX certifications.  ¶¶ 381-83. Notably, in March 2016, Valeant itself admitted that Schiller engaged in "improper conduct" that "contributed to the misstatement of [financial] results" and led to Valeant's restatement of its financial statements for fiscal year 2014 and the first quarter of 2015.  ¶ 39.

Schiller argues that Plaintiffs do not adequately allege that he participated in two acts of racketeering activity.  Schiller Br. at 3 n.2.  His rationale is that the cited acts of racketeering are the bases for Plaintiffs' securities fraud claims, and for that reason alone are insufficient.  *See id.* Unfortunately for Schiller, however, this Court has held the opposite.  *Valeant*, 2017 U.S. Dist. LEXIS 66037, at *46 (sustaining Section 10(b) claims).  Given that the Court has sustained securities fraud claims against Schiller, he is hard pressed to argue that the material misstatements that gave rise to those claims somehow do not count as racketeering activity.

### 3.    Plaintiffs Adequately Allege RICO Injury

Defendants do not challenge Plaintiffs' allegations that as the truth about Defendants' misrepresentations and omissions became public, Valeant's stock price fell, harming investors. Nor could Defendants make such a challenge, since in sustaining Section 10(b) claims against Defendants, this Court squarely rejected Defendants' loss causation arguments, holding that Plaintiffs had adequately pled loss causation as required by *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005).  *Valeant*, 2017 U.S. Dist. LEXIS 66037, at *39.

Defendants instead challenge Plaintiffs' allegations that Defendants have caused Plaintiffs' injuries with respect to their Valeant Notes.  Valeant Br. at 13-16.  This argument strains logic and the law.  As an initial matter, a loss in the market value of the Valeant Notes due to racketeering (here, securities fraud) *is* actionable.  New Jersey RICO defines racketeering to include "fraud in the offering, sale or purchase of securities," N.J. Stat. Ann. § 2C:41-1(p),

and there is nothing to suggest that the Valeant Notes are not securities. *See Reves v. Ernst & Young*, 494 U.S. 56, 65 (1990) (applying "a presumption that every note is a security"). To the extent Defendants' argument is that the New York City Funds have still made some money on the Valeant Notes, that argument goes to damages and is premature at the pleading stage.

Plaintiffs have adequately pled an injury. Just as Plaintiffs have adequately alleged that Defendants' misrepresentations proximately caused their common stock to decline in value, so too have Plaintiffs adequately pled that Defendants' misrepresentations caused their Valeant Notes to decline in value. All that is required is "allegations . . . of actual monetary loss, *i.e.*, an out-of-pocket loss." *Fimbel*, 2014 WL 6992004, at *7 (citing *Maio v. Aetna, Inc.*, 221 F.3d 472, 482-83 (3d Cir. 2000)). Notably, in the analogous context of alleged fraud related to the sale of asset-backed bonds (a debt security like the Valeant Notes), courts have similarly held that allegations of a drop in market price following a downgrade in bond ratings is sufficient to allege loss causation. *See In re Dynex Capital, Inc.*, No. 05 Civ. 1897 (HB), 2009 U.S. Dist. LEXIS 96527, at *58-60 (S.D.N.Y. Oct. 19, 2009).[12]

Here, as to each of Defendants' disclosures of the truth about their prior misrepresentations, Plaintiffs have specifically identified the Valeant Notes that fell in value and described by how much they fell. *See, e.g.*, ¶ 251 ("The price of certain Valeant Notes also fell significantly: the 5.375% Notes declined 7.36%; the 5.875% Notes declined 8.2%; the 6.125% Notes declined 6.57%; and the 5.5% Notes declined 12.44%."); *see also* ¶¶ 237, 240, 241, 242,

---

[12] Defendants rely on *Maio* to support their argument that it is not sufficient for Plaintiffs to allege that the value of the notes declined; rather, Plaintiffs must allege that Valeant failed to make fixed interest payment or redeem the notes at maturity. Valeant Br. at 14. The facts of *Maio*, where the plaintiffs had alleged that their health insurance was "inferior" because they speculated that they would receive something less than high quality health care when they needed it, are entirely distinguishable. *Maio*, 221 F.3d at 494-95. There, plaintiffs' injury depended on future events that had yet to transpire, *id.*; here, as demonstrated above, Plaintiffs allege that the value of Valeant's notes actually fell, and actually caused economic loss.

253, 264, 266, 267, 268, 274, 275, 281, 282, 283, 286.  Defendants are thus incorrect that Plaintiffs have "plead no facts" alleging that the Valeant Notes fell in value like Valeant's common stock and that allegations of "a corresponding deterioration of the Valeant Notes" are absent.[13]  Valeant Br. at 15.  On the contrary, such facts are pled in great detail – certainly in sufficient detail to satisfy a Rule 8(a)[14] pleading standard.

Valeant attempts to escape liability for its sales of the Valeant Notes to Plaintiffs by asserting that Plaintiffs were "downstream indirect purchasers" to whom they are not liable under *McCarthy v. Recordex Serv., Inc.*, 80 F. 3d 842, 848 (3d Cir. 1996).  Valeant Br. at 16 n.10.  *McCarthy* was predicated on violations of antitrust laws, where such a "direct purchaser" rule is a familiar concept; Defendants cite no case where, as here, the alleged RICO claims are predicated on *securities* fraud.  Indeed, a fraud measure of damages – as opposed to a contract measure of damages – is, and always has been, out-of-pocket loss as measured by the difference between the artificially inflated purchase price of a security and its true value, *i.e.*, how much it is actually worth.  This has been widely recognized by courts time and time again.  *See, e.g.*, *Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007) (acknowledging the "well-established common law rule that fraud damages represent the difference between the purchase price of the asset and its true value, plus interest, generally measured as of the date of sale").  Given that securities fraud is a predicate act of RICO in New Jersey, it stands to reason that fraud damages should suffice to plead injury.

---

[13] Defendants' citations to *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 271-74 (1992) (requiring direct injury), and *Fagan*, 2016 WL 347318, at *14 (requiring a "nexus between the RICO acts and the injury"), are thus inapposite.

[14] "It is well-established in this Circuit that RICO itself need only be pled under Rule 8(a), and that Rule 9(b) applies only to RICO predicate acts that themselves require the higher pleading standard."  *Myrus Hack, LLC v. McDonald's Corp.*, No. 05-2700, 2009 U.S. Dist. LEXIS 25765, at *24 (D.N.J. Mar. 27, 2009) (interpreting New Jersey's RICO statute).

### B.     Plaintiffs Adequately Allege Conspiracy in Violation of the New Jersey RICO Act

Defendants contend that Plaintiffs have failed to allege knowledge of the conspiracy and their agreement to participate in it.  *See* PwC Br. at 18, 20 (claiming that Plaintiffs fail to allege knowledge of the conspiracy and that Plaintiffs' allegations of an unlawful agreement are "collective and conclusory"); Valeant Br. at 16-18 (asserting that Plaintiffs' allegations of agreement are conclusory and "merely recite the elements of the claim"); Carro Br. at 10 (asserting that Plaintiffs fail to allege knowledge or agreement and instead "recite the bare elements of a conspiracy claim"); Schiller Br. at 3-4 (claiming that Plaintiffs do not "sufficiently allege . . . knowing agreement").  These arguments reflect a fundamental misapprehension of the standard for pleading knowledge and agreement as components of a RICO conspiracy.

To adequately plead a RICO conspiracy, Plaintiffs must allege an agreement by Defendants (1) "to conduct or participate in the conduct of the affairs of the enterprise"; and (2) "to commit, or to aid other members of the conspiracy to commit, at least two racketeering acts." *Ball II*, 141 N.J. at 176-80.  Notably, Plaintiffs need not show an *express* agreement to participate in unlawful acts.  *United States v. Fullmer*, 584 F.3d 132, 161 (3d Cir. 2009); *State v. Carbone*, 10 N.J. 329, 338 (1952).  Courts recognize that such a standard would be unworkable as a practical matter "[b]ecause the conduct and words of co-conspirators is generally shrouded in silence, furtiveness and secrecy[.]"  *State v. Samuels*, 189 N.J. 236, 246 (2007); *see also United States v. Dougherty*, 98 F. Supp. 3d 721, 744 (E.D. Pa. 2015) (quoting *United States v. McKee*, 506 F.3d 225, 238 (3d Cir. 2007) ("Of course, 'illegal agreements are rarely, if ever, reduced to writing or verbalized.'").  Accordingly, "[c]ourts have regularly held that conspiracy may be proven through circumstantial evidence."  *Cagno*, 211 N.J. at 512.  Such "circumstantial evidence [may be] 'based upon reasonable inferences drawn from actions and statements of the

30

conspirators or from the circumstances surrounding the scheme.'" *Fullmer*, 584 F.3d at 160

(quoting *McKee*, 506 F.3d at 238).[15]  Further, with respect to the knowledge element, "[a]

defendant's knowledge of the general nature of the enterprise and knowledge that the enterprise

extends beyond his or her individual role is sufficient." *Ball II*, 141 N.J. at 180.[16]  Here,

Plaintiffs have supported their allegations that Defendants knew of, and agreed to participate in,

the conspiracy with facts that make Defendants' knowledge and agreement manifest.[17]

### 1. PwC

PwC seeks dismissal of Plaintiffs' conspiracy claim for want of allegations of knowledge

or agreement.  PwC Br. at 18, 20.  But Plaintiffs allege that PwC, working in concert with the

other members of the Enterprise, knowingly created and disseminated false and misleading

financial statements to further the conspiracy.  ¶¶ 60-62, 234.  Specifically, PwC falsely

represented to investors that Valeant's accounting and SEC filings contained accurate

information about the Company's financial condition, business, and operations, particularly as it

related to the reasons for the sales growth that drove the Company's increased sales volume.

¶ 123.  PwC also falsely certified that Valeant's financial statements complied with GAAP and

were audited in accordance with GAAS, ¶¶ 123-32; that Valeant had effective internal controls,

¶ 123; and that its audit of Valeant complied with PCAOB standards, *id*.  These detailed

---

[15] "[I]nferences drawn from [circumstantial] evidence must bear a 'logical or convincing connection to established fact.'"  *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 425 (3d Cir. 2013) (quoting *United States v. Cartwright*, 359 F.3d 281, 291 (3d Cir. 2004)).

[16] *See also Mayo, Lynch & Assocs., Inc. v. Pollack*, 799 A.2d 12, 20 (N.J. Super. Ct. App. Div. 2002) ("It is ordinarily improper to grant summary judgment when a party's state of mind is in issue.").

[17] Defendants criticize Plaintiffs for alleging that the Enterprise began in 2013 (*see* ¶¶ 380, 393) but that Valeant's acquisitions of other pharmaceutical companies began as early as 2008 (*see* ¶¶ 2, 30).  *See* Valeant Br. at 17.  There is nothing contradictory about these allegations, however. Plaintiffs allege that Valeant's AF program began in 2013, and that 2013 was when all of the elements of the Enterprise were in place.  That certain activities which subsequently became part of the Enterprise began earlier, in 2008, is irrelevant.

allegations of conduct designed to conceal Philidor's role in Valeant's revenue growth advanced the ends of the alleged conspiracy and are a far cry from what PwC characterizes as "mere legal conclusions" that PwC participated in the conspiracy.  *See* PwC Br. at 20.

*Mayo*, 799 A.2d at 14-16, is instructive.  In *Mayo*, the defendant attorney was alleged to have intentionally provided "blatantly incorrect legal opinions" designed to conceal deficiencies in a certain contractor's bid to perform construction and engineering work on a sewage treatment plant.  *Id.* at 14-16, 18.  "[T]he trial judge determined that there was insufficient evidence to support a finding that [the defendant] was aware of or knowingly engaged in the bid-rigging enterprise."  *Id.* at 13.  The Appellate Division reversed the trial court's grant of summary judgment, however, noting that the defendant attorney's state of mind was a triable issue of fact. *Id.* at 20.  In so holding, the Appellate Division noted that "[a] jury could conclude that [the defendant's] *failure to conduct any investigation, in violation of his professional obligation to investigate* . . . indicated an intentional participation in the scheme[.]"  *Id.* at 19 (emphasis added).  Here, following the logic of *Mayo*, PwC's failure to act on significant unusual Philidor-related transactions, which under accounting rules pose a substantial risk of fraud and thus obligated PwC to pursue further inquiry, suffices to create a triable issue of fact with respect to PwC's knowledge of the conspiracy.  *See* ¶¶ 123-32.

PwC cites *Ball II*, 141 N.J. 142, PwC Br. at 17-18, but the court in that case held that racketeering acts aimed at furthering the conspiracy *indisputably* evidence agreement to participate in the conspiracy.  *Ball II*, 141 N.J. at 187 ("defendants did actually commit acts of racketeering to further the conspiracy; thus, agreement to the commission of those acts is indisputable").  Here, Plaintiffs allege that PwC knowingly facilitated the scheme to conceal material aspects of Valeant's operations and financial condition to further the aims of the

conspiracy.  *See* ¶ 234 (describing how PwC's numerous "misrepresentations were crucial to the Enterprise's ability to conceal Valeant's true relationship with Philidor from investors . . . and therefore [crucial] to the overall scheme to inflate Valeant's securities prices").  Plaintiffs further allege that PwC affirmatively and actively worked to obscure Philidor's role in Valeant's revenue growth.  *See* ¶ 60 (describing PwC's "direct knowledge" of the fraud surrounding Philidor); ¶ 232 (describing how PwC provided false assurances to Valeant investors "notwithstanding its knowledge and review of Valeant's relationship with Philidor").  These allegations reflect that PwC understood the general nature of the enterprise and its role in the alleged conspiracy, and thus meet the pleading requirements for knowledge of a RICO conspiracy.  *See Ball*, 141 N.J. at 180.

PwC cites *Emcore*, 102 F. Supp. 2d at 249, to buttress its contention that Plaintiffs have not sufficiently alleged PwC's knowledge.  *See* PwC Br. at 18 n.11.  In *Emcore*, however, the court wrote that the plaintiff "averred generally fraudulent intent" because it "has plead facts that support the inference of such intent[,]" notwithstanding its ultimate conclusion that the plaintiff failed to allege a RICO conspiracy.  *Emcore*, 102 F. Supp 2d. at 248-49 (internal quotation marks omitted).  *Emcore* thus undercuts PwC's arguments as to knowledge.

## 2.  Valeant and Rosiello

Valeant and Rosiello do not contest their knowledge of the alleged conspiracy.  *See* Valeant Br. at 16-18.  Rather, they contend that the Complaint "is devoid of the required factual allegations" regarding an agreement to participate in the alleged conspiracy.  Valeant Br. at 17.  At most, they say, Plaintiffs have alleged "parallel business conduct by independent entities."  *Id.*

Valeant and Rosiello's characterization ignores the Complaint.  The Complaint describes a highly coordinated and concerted effort to institute a deceptive business model and to conceal the true nature of that business model—all in furtherance of the aims of the conspiracy.  *See*, *e.g.*,

33

¶ 36 (describing Pearson's close coordination with Schiller, Carro, and Pearson[18] in falsely attesting to the accuracy of Valeant's financial disclosures and the efficacy of Valeant's internal controls); ¶ 38 (describing how Schiller worked in concert with Pearson to orchestrate the artificial inflation of the price of Valeant securities); ¶ 40 (describing how Rosiello directed Valeant's growth-by-acquisition, price gouging, and AF strategies; personally supervised the preparation of false and misleading financial disclosure statements; and misrepresented the true sources of Valeant's revenue growth to investors); ¶ 73 (describing Pearson's coordination with other top executives in establishing new price points in the course of gouging customers);  ¶ 82 (describing Valeant's methodical creation of a distribution network of captive pharmacies named after chess players and chess strategies and provision of resources to Philidor); ¶ 96 (describing Valeant's systematic establishment of a web of shell companies named for chess players and chess strategies designed to conceal its ownership interests in pharmacies around the country); ¶ 136 at 53 (describing the enterprise's repeated misrepresentations as to the true source of Valeant's revenue growth); ¶ 138 at 54 (describing a conference call jointly hosted by Pearson and Schiller in which they misrepresented the true source of Valeant's revenue growth); ¶¶ 177-212 (detailing how Defendants secretly established Philidor and a captive network of pharmacies with which to price gouge their customers and the extensive effort to conceal Philidor's ties to Valeant through false public statements and false public accounting filings).

The fact that Valeant and Rosiello participated in keeping Philidor a secret and misrepresenting Valeant's ownership and control over Philidor "objectively manifest[]" Valeant and Rosiello's agreement to commit racketeering acts. *The Knit With v. Knitting Fever Inc.*, 625

---

[18] Pearson joins in Valeant's and Rosiello's brief.  To the extent he makes the same arguments they do regarding lack of agreement to participate in the alleged conspiracy, Plaintiffs likewise make the same arguments in opposition.

F. App'x 27, 36 (3d Cir. 2015).  Indeed, these racketeering acts, which were designed to advance the ends of the conspiracy so that Valeant could continue generating price-driven revenue growth, constitute "indisputable" evidence of Valeant and Rosiello's agreement to participate in the conspiracy, and meet the relevant pleading standards.  *Ball II*, 141 N.J. at 187.

### 3.    Carro

Carro argues that "absent [from the Complaint] are *any* factual allegations supporting the notion that [she] knowingly agreed to participate in the affairs of a racketeering enterprise." Carro Br. at 10.  This is wrong.  As detailed in Section I.A.2.b.ii, *supra*, the Complaint contains allegations that Carro supervised and directed the preparation of Valeant's materially misleading financial statements, and drafted, prepared, and approved additional false and misleading SEC filings and other public statements.  ¶¶ 41, 307.  In so doing, the Complaint alleges that Carro committed numerous acts of securities fraud, as well as mail and wire fraud.  ¶¶ 41, 307, 381-83. The nature of the information intentionally concealed from Valeant's false public statements objectively manifests Carro's knowing agreement to participate in the conspiracy, and satisfies the pleading requirement with respect to her.  *See The Knit With*, 625 F. App'x at 36; *Ball II*, 141 N.J. at 187; *see also T. Rowe*, 2018 U.S. Dist. LEXIS 6134, at *22-23 (finding "allegations that Carro approved improper accounting relating to Philidor, publicly defended the improper accounting in response to a report questioning whether Valeant was inflating revenue, and was ultimately placed on administrative leave for 'improper conduct' related to Valeant's accounting restatement, including providing inaccurate information to the Ad Hoc Committee investigating the false revenues" adequate to support Carro's scienter for purposes of a Section 10(b) claim).

### 4.    Schiller

Schiller likewise argues that "Plaintiffs do not sufficiently allege his knowing agreement to further the supposed unlawful objectives of the alleged 'enterprise.'"  Schiller Br. at 3.  But

the Complaint tells another story. *See, e.g.*, ¶ 36 (describing Pearson's close coordination with Schiller, Carro, and Tanner in falsely attesting to the accuracy of Valeant's financial disclosures and the efficacy of Valeant's internal controls); ¶ 38 (describing how Schiller worked in concert with Pearson to orchestrate the artificial inflation of the price of Valeant securities). Plaintiffs allege that "Schiller coordinated closely with senior Valeant and Philidor executives and was intimately involved in the planning, approval, direction, and monitoring of every aspect of the scheme, including directly authorizing the implementation of illegal practices in Valeant's AF program." ¶ 37. Schiller is further alleged to have "facilitated the artificial inflation of the price of Valeant securities by, among other things, concealing[19] the relationship between Valeant and Philidor by failing to disclose Philidor as a variable interest entity ("VIE") in Valeant's year-end financial statements." ¶ 38. Plaintiffs allege that because of his role in creating and overseeing the AF strategy, Schiller turned a blind eye to Valeant's Chief Compliance Officer's concerns over Tanner's dual role at Valeant and Philidor. *See* ¶ 86. And finally, Plaintiffs enumerate a series of occasions on which Schiller made material misrepresentations related to Valeant's business model and the sources of its revenue growth, including:

- misrepresentations regarding "organic growth" at Valeant made on a January 4, 2013 conference call with investors, ¶¶ 137-38 at 54;

- misrepresentations regarding "organic growth" and "positive growth" for Valeant's Neuro business made on a February 28, 2013 conference call with investors, ¶ 139 at 54;

- misrepresentations regarding improving revenue growth rates, strong organic growth, and the sustainability of Valeant's business model on a January 7, 2014 conference call with investors, ¶ 142;

- misrepresentations regarding the legitimacy and level of risk associated with Valeant's business model made in Valeant's 2013 10-K, filed on February 28, 2014 and signed by Schiller, ¶ 144;

---

[19] As *Fagan*, 2016 WL 347318, at *13, counsels, the attempt to conceal fraud, as Schiller did here, is highly probative of a defendant's intent to participate in a conspiracy.

36

- misrepresentations regarding the extent to which research and development were driving Valeant's revenue growth made in Valeant's 1Q14 10-Q, filed on May 9, 2014 and signed by Schiller, ¶ 148;

- misrepresentations regarding the strength and sustainability of Valeant's business model made on a June 17, 2014 conference call with investors, ¶ 156;

- misrepresentations regarding the risk level associated with Valeant's business strategies and the purported resulting growth made in Valeant's 2Q14 10-Q, filed on August 1, 2014 and signed by Schiller; ¶ 162;

- misrepresentations regarding the source of revenues for Valeant's dermatology business made on a February 23, 2015 conference call with investors, ¶ 166;

- misrepresentations regarding the source of Valeant's revenue growth and cost advantages made in Valeant's 2014 10-K, filed on February 25, 2015 and signed by Schiller, ¶ 167.

- misrepresentations about the profitability of Valeant's AF program made at a public conference on June 11, 2013, ¶ 180;

- misrepresentations about Valeant's limited or lack of control over the pricing and sales volumes of certain products distributed by third parties, and more generally the failure to disclose Valeant's relationship with Philidor, in Valeant's 2Q13 10-Q, 3Q13 10-Q, 2013 10-K, 1Q14 10-Q, 2Q14 10-Q, and 3Q14 10-Q, all of which were signed by Schiller, ¶¶ 183-84, 186;

- misrepresentations that Valeant's 2013 and 2014 10-Ks, as well as its 1Q15 and 2Q15 10-Qs, all of which were signed by Schiller (and which failed to consolidate Philidor), were prepared in accordance with GAAP, ¶¶ 187-89, 191, 194-96; and

- misrepresentations about the effectiveness of Valeant's internal controls, and the absence of untrue statements or omissions of material fact, in a number of SEC filings signed by Schiller, including Valeant's 1Q13 10-Q, 2Q13 10-Q, 3Q13 10-Q, 1Q14 10-Q, 2Q14 10-Q, 3Q14 10-Q, 1Q15 10-Q, the 2Q15 10-Q, and the 2014 10-K, ¶¶ 221-22, 223, 225.

*Ball II's* holding on agreement to conspire is inescapable: "defendants did actually commit acts of racketeering to further the conspiracy; thus, agreement to the commission of those acts is indisputable[.]"  141 N.J. at 187.  Having shown that Schiller committed numerous racketeering acts to advance the aims of the conspiracy, Plaintiffs have sufficiently alleged the element of agreement.  *See id.*

37

## II.   THE COMPLAINT ADEQUATELY ALLEGES VIOLATIONS OF THE EXCHANGE ACT

### A.   Plaintiffs Adequately Allege PwC's Violations of Section 10(b)

Only PwC challenges Plaintiffs' claim for violations of Section 10(b) of the Exchange

Act, and only on the basis that Plaintiffs have failed to allege PwC's scienter.[20]  For the reasons

articulated below, the Court should reject PwC's arguments, just as it has rejected similar efforts

by the Valeant Defendants to avoid Section 10(b) liability.

### 1.   Legal Standard

In the Third Circuit, scienter is "a knowing or reckless state of mind."  *Institutional Inv'rs*

*Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009).  In determining whether scienter is

adequately pled, "courts must consider the complaint in its entirety. . . . The inquiry . . . is

whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not

whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs, Inc. v.*

*Makor Issues & Rights, Ltd.*, 551 U.S. 309-10, 322-23 (2007).  Moreover, "[t]he inference that

the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or

even the 'most plausible of competing inferences.'"  *Id.* at 324 (citation omitted).  A strong

inference arises if a reasonable person would "deem the inference of scienter at least as strong as

any opposing inference[.]"  *Id.* at 326.  Thus, when opposing inferences are in equipoise,

plaintiffs prevail.  *Id.*

With respect to auditor liability, "[a]t the pleading stage, courts have recognized that

allegations of GAAS violations, coupled with allegations that significant 'red flags' were

ignored, can suffice to withstand a motion to dismiss."  *In re Suprema Specialties, Inc. Sec.*

---

[20] PwC complains that Plaintiffs only mention its scienter once, in the "Scienter" section of the Complaint, at ¶¶ 297-351. PwC Br. at 11. PwC, however, is apparently blind to the fact that in the very first paragraph of that section, Plaintiffs incorporate every paragraph that came before. ¶ 297. Those prior paragraphs are replete with allegations of PwC's scienter.

*Litig.*, 438 F.3d 256, 279 (3d Cir. 2006).  PwC cherry picks the language in *Suprema Specialties* and argues that Plaintiffs must allege a "pretended audit," PwC Br. at 14; *Suprema Specialties*, however, simply observes that "[a] showing that an auditor … engaged in auditing practices so shoddy that they amounted at best to a 'pretended audit' has traditionally supported a *finding of liability*," *Suprema Specialties*, 438 F. 3d at 279 (emphasis added), and is careful to distinguish a motion to dismiss, where "plaintiffs are entitled to the benefit of all reasonable inferences," *id.* at 281.  As to other portions of *Suprema Specialties* that are unhelpful (the Third Circuit did, after all, vacate the dismissal of claims against an auditor), PwC downplays the decision as "pre-*Tellabs*."  PwC Br. at 10 n.7.[21]  Yet PwC does not claim that *Tellabs* contradicts or otherwise disturbs the relevant portion of *Suprema Specialties*.  And indeed, courts in this District continue to rely on it as good law.  *See Sun v. Han*, No. 15-703 (JLL), 2015 WL 9304542, at *12-14 (D.N.J. Dec. 21, 2015) (quoting *Suprema Specialties*, 438 F.3d at 279-81).

Here, Plaintiffs have pled violations of GAAS and significant red flags, and thus adequately alleged PwC's scienter.

**2.      Plaintiffs Allege that PwC Knowingly Violated GAAS, Overlooked "Red Flag" Indicators of Fraud, and Accorded Special and Differential Disclosure Treatment to Philidor**

In signing off on Valeant's 2014 audit, PwC knowingly approved of Valeant's decision not to disclose its true relationship with Philidor in the Company's public financial statements.  *See* ¶¶ 123-32.  Doing so was a direct violation of PwC's responsibility under PCAOB audit standards (GAAS) to closely consider "significant unusual transactions" and "transactions that

---

[21] Oddly, PwC prefers to rely on Second Circuit cases, *see* PwC Br. at 10, 11, 13, 14 (citing *In re Advanced Battery Techs., Inc.*, 781 F. 3d 638, 644 (2d Cir. 2015); *Athale v. SinoTech Energy Ltd.*, No. 11 Civ. 0531(AJN), 2014 WL 687218, at *5 (S.D.N.Y. Feb. 21, 2014); and *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 393-95 (S.D.N.Y. 2007) – a choice of legal authority PwC justifies by pointing to *dicta* in a pre-*Tellabs* case of its own, *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997), in which no auditor was named as a defendant, and the court expressed no opinion on sufficiently pleading an auditor's scienter.

occurred outside the normal course of business," since such transactions posed a significant risk of fraud.  ¶ 126 (citing AU 316.66).

Multiple red flags were obvious, but PwC chose to ignore them.  The transaction through which Valeant acquired its ownership interest in Philidor was highly unusual, and carefully structured to conceal the relationship from outsiders.  ¶¶ 106-07.  Instead of acquiring Philidor outright, Valeant secured the Philidor Option: an option, at a cost of $100 million, with $133 million of additional incentive-based payments, to purchase Philidor for $0.  ¶¶ 106; 127.  Thus, the most basic details of the option transaction—its one-of-a-kind structure and its significant size—were red flags bright enough to trigger PwC's obligation under GAAS to closely examine the transaction for indicia of fraud.  ¶¶ 106-07, 123-26.

The red flags did not stop there, however.  The Philidor Option was also "significant" and "unusual" because Philidor was one of Valeant's principal distributors, and therefore PwC had an obligation to (and did) request information from Philidor to complete its audit of Valeant, giving it access to explore and understand Valeant's relationship with Philidor.  ¶¶ 127, 232.  Further, the Philidor Option represented the first time Valeant acquired an ownership stake in a pharmacy distribution channel.  *Id.*  Moreover, Valeant was Philidor's only customer – Philidor distributed only Valeant products.  ¶¶ 51, 250.  Finally, although Valeant agreed to pay up to $233 million for Philidor and remained silent about the transaction in its public financial statements, the Company disclosed two *smaller* transactions, involving the acquisition of Natur Produkt International, JSC ($149.9 million) and Gerot Lannach ($164 million), in its 2014 10-K.  ¶ 129.[22]

---

[22] PwC argues that the disclosure of these smaller transactions "says nothing about the materiality of the Philidor transaction, which had to be assessed based on its own circumstances and the current 2014 materiality threshold."  PwC Br. at 13 n.10.  PwC overlooks, however, that

Further, had PwC scrutinized the Philidor Option in accordance with its obligations under GAAS, it would have discovered that the acquisition was routed through KGA Fulfillment Services, Inc., a wholly owned Valeant subsidiary. ¶ 108. "KGA" stands for "King's Gambit Accepted," a chess term and part of a covert network of chess-themed pharmacies and other entities through which Valeant could pursue deceptive and illegal sales practices. ¶¶ 108-09. Indeed, the purchase agreement between Valeant and Philidor required Valeant to execute subsequent agreements with additional shell companies with chess-themed names owned by Philidor to conceal the nature and extent of the Valeant-Philidor relationship. ¶¶ 107-09.

The sheer significance of Philidor to Valeant's financial health was another red flag. Morgan Stanley estimated that Philidor accounted for 55% (15 of 27 percentage points) of Valeant's U.S. year-over-year organic growth. ¶¶ 131, 207. BMO Capital Markets likewise concluded that Philidor's secret pharmacy channel represented 10% of Valeant's revenue. ¶ 131. Notably, moreover, issues related to revenue recognition, company acquisitions, and inventory accounting were raised by the SEC in comment letters to the Company as early as 2012. In particular, in a letter to the Company on May 16, 2012,[23] the SEC questioned unusual gains from company acquisitions and accounting for inventory obsolescence. In another letter dated September 18, 2013,[24] the SEC raised concerns about revenue recognition for distributor

in 2014, Valeant *did* determine that Philidor was material for purposes of SOX testing of internal controls over financial reporting – just not for purposes of disclosing it to the investing public. ¶ 130.

[23] Letter from Jim B. Rosenberg, Senior Assistant Chief Accountant, U.S. Securities and Exchange Commission, to Howard B. Schiller, Executive Vice President and Chief Financial Officer, Valeant Pharmaceuticals International, Inc. (May 16, 2012) (*available at* https://www.sec.gov/Archives/edgar/data/885590/000000000012025506/filename1.pdf). A court may take judicial notice of SEC filings. *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 163 n.3 (3d Cir. 2014).

[24] Letter from Jim B. Rosenberg, Senior Assistant Chief Accountant, U.S. Securities and Exchange Commission, to Howard B. Schiller, Executive Vice President and Chief Financial

shipments and revenue disclosures for separate product lines.  These comment letters were available to PwC at all times.

These red flags were obvious to PwC because PwC audited Valeant's financial statements, but it either failed to inquire or deliberately ignored them.  Plaintiffs have therefore alleged a number of violations of GAAS by PwC:

- PwC violated GAAS by failing to perform its audit to obtain reasonable assurance about whether Valeant's consolidated financial statements were free of material misstatement, error, or fraud, in violation of AU 110.02, ¶ 137 at 44;

- PwC violated GAAS by failing to perform its audit to obtain reasonable assurance about whether material weaknesses existed in Valeant's internal controls over financial reporting, in violation of AS 5.03, *id.*;

- PwC violated GAAS by failing to reduce the risk that it expressed an inappropriate audit opinion to a "low" level, in violation of AS 8.03, AS 8.04, AS 12.04, AS 12.59, and AS 13.08, ¶ 138 at 44;

- PwC failed to exercise "professional skepticism" and exhibit "an attitude that includes a questioning mind and a critical assessment of audit evidence" during its audit, in violation of AS 8.03, AS 12.04, AS 12.59, and AS 13.08, *id.*;

- PwC failed to conduct a "reasonable investigation" prior to the reissuance of previously released audit reports as to whether material events requiring disclosure had occurred and failed to advise Valeant to make appropriate disclosures in violation of AU 711.10, AU 711.11, AU 711.12, and AU 561.06, ¶ 139 at 45-46;

- PwC failed to make additional inquiries and perform additional procedures to ascertain whether material modifications should be made to Valeant's disclosure statements when it became aware that Valeant's Forms 10-K and/or 10-Q were not compliant with GAAP, in violation of AU 722.15 and AU 722.22, ¶ 122; and

- PwC failed to examine the significant unusual transactions related to Philidor in violation of the duty to consider such transactions closely, in violation of AU 316.66, ¶ 126.

Thus, Plaintiffs plead "allegations of GAAS violations, coupled with allegations that significant 'red flags' were ignored."  *Suprema Specialties*, 438 F.3d at 278.  Notably, "the less complex the

---

Officer, Valeant Pharmaceuticals International, Inc. (Sept. 18, 2013) (*available at* https://www.sec.gov/Archives/edgar/data/885590/000000000013051274/filename1.pdf).

rules violated, the greater the magnitude of the irregularities and the more frequent the violations, the stronger is the inference that conscious fraud or recklessness is the explanation for the auditor's role in the violations." *Sun*, 2015 WL 9304542, at *13 (quoting *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620 (E.D. Va. 2000)).  Here, PwC violated fundamental and simple audit rules pertaining to its objectivity and basic duties to investigate unusual transactions for indicia of fraud.  The violation of such straightforward rules only buttresses the inference that the violation was a knowing one.  *See id.*

### 3.  The Totality of the Circumstances Suggests That the Inference That PwC Knew of Valeant's Desire to Conceal Its Relationship with Philidor Is at Least as Strong as Any Opposing Inference

All these circumstances, considered together – the red flags, the GAAS violations, and especially the preferential disclosure treatment accorded to the Philidor acquisition – bespeak PwC's knowledge of or deliberate disregard for Valeant's desire to conceal its relationship with Philidor.  Nonetheless, PwC argues that there are two more compelling inferences that account for these circumstances.  PwC Br. at 14-15.  First, PwC points the finger at its former client, arguing that PwC, too, was a victim, and was "misled" by Valeant.  *Id.* at 15.  Second, PwC argues that its "evaluation of [Valeant] management's positions was simply mistaken[.]"  *Id.* These are not plausible inferences in light of the facts.  Indeed, both cannot simultaneously be true; PwC's suggestion that on the one hand, it did its job well but was lied to, and on the other hand it was simply careless, does not hold water.  That PwC would offer mutually exclusive explanations for its conduct is itself an indication of the plausibility and credibility of the respective inferences it asks this Court to draw.  Notably, under *Tellabs*, PwC cannot offer just *any* inference of its innocence; rather, it must offer an inference of innocence that outweighs Plaintiffs' inference of knowledge or recklessness.  551 U.S. at 326.

A transaction of the magnitude of the Philidor Option, plainly structured to conceal its

true purpose from the investing public, executed through a tangle of shell companies with chess-themed names that intimated the presence of a fraud scheme, and aimed at a market segment that Valeant had never before pursued, are significant red flags that a reasonable auditor would have recognized and acted upon.[25]  This weighs heavily in support of an inference of scienter. Critically, the Third Circuit has noted that "[i]n assessing the allegations holistically as required by *Tellabs*, the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective."  *Avaya*, 564 F.3d at 272-73.  Here, the "practical and common-sense" explanation that ties together PwC's dereliction of its obligations under GAAS, its active choice to ignore significant indicators of fraud, and its endorsement of Valeant's choice not to disclose the Philidor acquisition while disclosing less material acquisitions, is that PwC knew of Valeant's desire to conceal its relationship with Philidor, or at the very least recklessly disregarded it.

### 4.    PwC's Remaining Arguments Fail

Remarkably, PwC argues "[a]t the threshold" that with respect to Plaintiffs' allegations of accounting rules, "this kind of allegation is completely insufficient[]" to plead Section 10(b) liability.  PwC Br. at 12.  But this is not the law in the Third Circuit, where violations of accounting rules are absolutely relevant, and in combination with allegations of red flags are a basis of pleading scienter.  *Suprema Specialties*, 438 F.3d at 256.  Indeed, "[i]n many cases, the most plausible means to prevail on a section 10(b) claim against an auditor without that ever-elusive 'smoking gun' document or admission will be to show how specific and not insignificant accounting violations collectively raise an inference of scienter."  *In re IKON Office Sols., Inc.*,

---

[25] PwC argues that allegations that it should have heeded red flags "sound[] in negligence, not fraud."  PwC Br. at 14.  Not so.  Allegations, as here, that an auditor "knew of, or willfully turned a blind eye to" fraud "surpass an inference of ordinary negligence[.]"  *Suprema Specialties*, 438 F.3d at 281.

277 F.3d 658, 677 n.26 (3d Cir. 2002).  Plaintiffs have done so here.

PwC also argues that Plaintiffs' allegations amount to "fraud by hindsight."  PwC Br. at 12.  This argument remarkably disregards the size of the Philidor transaction, the web of curiously named shell companies underlying the transaction, the focus on a new market segment, the purchase of a significant Valeant distributor to whose books and records PwC had access, and the unique structure of the transaction – all "red flag" indicators of fraud which were readily ascertainable at the time of PwC's audit, and not by hindsight.  Indeed, this argument ignores Plaintiffs' explicit allegations, based on interrogatory responses submitted by Philidor to the U.S. Senate Special Committee on Aging, that PwC had evaluated Valeant's relationship with Philidor subsequent to them entering into the purchase option agreement and that Philidor had communicated with PwC in the course of its "day-to-day business" to "satisfy any and all information requested," including by providing "requested information" in PwC's end-of-year audits for fiscal years 2014 and 2015, and for PwC's quarterly audits from the first quarter of 2015 through the fourth quarter of 2015.  ¶ 232.

Finally, PwC faults Plaintiffs for not alleging any motive to defraud on the part of PwC. PwC Br. at 11.  As noted above, PwC was paid audit fees of $13.4 million, $12.6 million, and $20.5 million for its services to Valeant in 2013, 2014, and 2015, respectively.  ¶ 230.  PwC had every incentive to maintain Valeant as a client.  Even so, however, Plaintiffs are not required to allege a motive.  *Tellabs*, 551 U.S. at 325.[26]

---

[26] PwC's cases on this point stand, at most, for the proposition that a desire to receive professional fees is insufficient, standing alone, to adequately allege scienter.  *See* PwC Br. at 11 n.8 (citing *Klein v. Autek Corp.*, 147 F. App'x 270, 277 (3d Cir. 2005); and *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 238 (3d Cir. 2004)).  But as detailed above, this is hardly the sole basis for PwC's scienter.  Consistent with *Tellabs*, PwC's receipt of substantial fees should be considered collectively with Plaintiffs' other allegations.  *Tellabs*, 551 U.S. at 322-23.

**B.      Plaintiffs' Section 18 Claims Against the Valeant Defendants[27] Are Timely**

Section 18 of the Exchange Act "creates a private remedy for damages resulting from the purchase or sale of a security in reliance upon a false or misleading statement contained in any document or report filed with the SEC pursuant to the Exchange Act."  *Suprema Specialties*, 438 F.3d at 283 (citing 15 U.S.C. § 78r(a)).  Section 18 states that claims must be brought "within one year after the discovery of the facts constituting the cause of action and within three years after such cause of action accrued," 15 U.S.C. § 78r(c), although these periods were extended to two years and five years, respectively, by the Sarbanes-Oxley Act, 28 U.S.C § 1658(b).  The Valeant Defendants argue that Plaintiffs' Section 18 claims are untimely.  Valeant Br. at 21-24; Pearson Br. at 2; Schiller Br. at 4.

**1.      Plaintiffs' Claims Are Timely Under a One-Year Statute of Limitations**

As Defendants themselves allude to, Valeant Br. at 1, Plaintiffs' case shares the same facts and many of the same claims as the related class action, *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, No. 15-7658 (MAS) (LHG).  Where newly filed claims share such a "common factual and legal nexus" with claims filed in a prior class action, the claims are "substantively identical," and tolling of the statute of limitations is appropriate under the Supreme Court's decision in *American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 544 (1974).[28]  *Crump v. Passaic Cty.*, 147 F. Supp. 3d 249, 261 (D.N.J. 2015) (citing *In re Cmty. Bank of N. Virginia*, 622 F.3d 275, 300 (3d Cir. 2010), *as amended* (Oct. 20, 2010) (noting a line of authority holding that "where claims brought in a subsequent suit share a common factual and legal nexus with those brought in the prior class action, there is no persuasive reason for refusing to apply class action tolling, as the

---

[27] Plaintiffs have dismissed their Section 18 claims against Carro without prejudice.  Dkt. No. 41.
[28] In *American Pipe*, the Supreme Court held that the "commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action."  414 U.S. at 554.

defendant will already have received adequate notice of the substantive nature of the claims against it and likely would rely on the same evidence and witnesses in mounting a defense."). This is consistent with the holding of *American Pipe*, because "the defendants have the essential information necessary to determine both the subject matter and size of the prospective litigation." *Id.* (citing *American Pipe*, 414 U.S. at 554-55).[29]

### 2.    Plaintiffs' Claims Are Timely Under a Three-Year Statute of Repose

Plaintiffs' purchases of Valeant securities after January 2, 2015 all fall within the statute of repose and are thus timely.[30]

Defendants suggest that a Section 18 claim "accrues," for purposes of triggering the statute of repose, on the earlier of the date of the relevant SEC filing or the date of purchase. Such a rule, however, has no basis in the statute or legal authority interpreting it.  It is directly contrary to the express language of Section 18, which states that the three-year period runs from the date the "*cause of action* accrued."  15 U.S.C. § 78r(c) (emphasis added).  A cause of action cannot accrue until a plaintiff can bring suit, and this could not have happened before a plaintiff purchased the subject securities; it would be odd, indeed, if an investor's cause of action accrued before she ever invested.  The three out-of-circuit district court cases Defendants cite, moreover,

---

[29] Every one of the district court cases Defendants cite to support the proposition that the filing of a Section 10(b) class claim should not toll the statute of limitations for a Section 18 claim is outside this District and Circuit.  *See* Valeant Br. at 23-24.  And there is appellate authority rejecting the assumption underlying these cases, namely that there must be an identity between individual claims and class claims.  *See Tosti v. City of Los Angeles*, 754 F.2d 1485, 1489 (9th Cir. 1985) ("We find no persuasive authority for a rule which would require that the individual suit must be identical in every respect to the class suit for the statute to be tolled.  Such a rule would be illogical because one of the primary reasons a member will opt out of a class suit is that she has strong individual claims against the defendant that she believes will not be redressed by the overall class settlement.").

[30] Defendants count 38 purchases of Valeant securities prior to January 2, 2015.  Valeant Br. at 22 n.13 (citing Compl. at Ex. 1).  These purchases are timely if the Court accepts the reasons given in Section II.B.3, *infra*.  If the Court does not, then only purchases after January 2, 2015 are timely.

are not controlling, much less support Defendants' proposed rule.  Only one – *Kelley v. Rambus, Inc.*, No. C 07-01238 JF, 2008 WL 1766942, at *5 (N.D. Cal. Apr. 17, 2008) – measures the three-year period from the date of an SEC filing, and does so with no analysis; it does not even appear that the court considered measuring it from the date of purchase.  Defendants' second case, *Oaktree Capital Mgmt., L.P. v. KPMG*, 963 F. Supp. 2d 1064, 1092 (D. Nev. 2013), actually holds the opposite, and measures the three-year period from the date of purchase.  *See* 963 F. Supp. 2d at 1082 n.14.  And Defendants' final case, *In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*, No. 03 MD 1529 (LMM), 2005 WL 1679540, at *1 n.6 (S.D.N.Y. Jul 18, 2005), does not decide, either way, which rule should apply, but simply holds that under either method, the claims are untimely.[31]  Notably, case law from *within* this Circuit supports Plaintiffs' position.  *See WM High Yield Fund v. O'Hanlon*, No. 04-3423, 2005 WL 6788446, at *11 (E.D. Pa. May 13, 2005) (measuring three-year period from date of purchase); *Discovery Global Citizens Master Fund, Ltd. v. Valeant Pharms. Int'l, Inc.*, No. 16-7321 (MAS) (LHG), 2018 U.S. Dist. LEXIS 6219, at *16 n.8 (D.N.J. Jan. 12, 2018) (same); *T. Rowe*, 2018 U.S. Dist. LEXIS 6134, at *17 n.9 (same).

### 3.     The Sarbanes-Oxley Act Expanded Section 18's Limitation Periods

The Sarbanes-Oxley Act of 2002 was designed to restore trust in the financial markets and to protect the public from accounting fraud by improving the accuracy of corporate disclosures.  *See* S. Rep. No. 107-146, pp. 2-11 (2002).  One provision of Sarbanes-Oxley extended the limitations period for certain securities law violations to two years from discovery of the misstatements, or five years from the violations.  *See* 28 U.S.C. § 1658(b).  According to the statute, these longer limitations periods apply to a "private right of action that involves a

---

[31] *Adelphia* holds that Sarbanes-Oxley's expanded two- and five-year limitations periods apply to Section 18 claims.  2005 WL 1679540, at *4; *see* Section II.B.3, *infra*.

claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws." *Id.*

Although the Third Circuit has not addressed whether the limitations periods contemplated by 28 U.S.C. § 1658(b) apply to claims brought under Section 18, the Second Circuit has squarely held that "Section 18(a) is governed by § 1658(b)." *Dekalb Cty. Pension Fund v. Transocean Ltd.*, 817 F.3d 393, 407 (2d Cir. 2016), *as amended* (Apr. 29, 2016), *cert. denied*, 137 S. Ct. 2326, 198 L. Ed. 2d 755 (2017).[32]  The Second Circuit thought it "significant that Section 18(a) imposes liability 'unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading.'" *Id.* (quoting 15 U.S.C. § 78r(a)).  The court reasoned that the choice of Congress to provide for a good-faith defense means that "as a practical matter, Section 18(a) actions will generally involve proof of a defendant's state of mind, and recovery will be permitted only where a defendant acted, at a minimum, recklessly." *Id.*  The Fifth Circuit has also adopted this position.  *See id.*

This Court should follow the Second Circuit's sound reasoning, apply the limitations period contained in 28 U.S.C. § 1658(b), and hold that all of Plaintiffs' claims – even those arising from the pre-January 2, 2015 purchases Defendants identify, *see* Valeant Br. at 22 n.13 – are timely.[33]

---

[32] *See also Teachers Ret. Sys. of La. v. Qwest Commc'ns Int'l Inc.*, No. 04CV0782REBCBS, 2005 WL 2359311, at *3 (D. Colo. Sept. 23, 2005) (holding that Section 1658(b)'s limitations periods apply to Section 18 claims); *Adelphia*, 2005 WL 1679540, at *4 (same).  Notably, none of the district court cases cited by Defendants consider the Second Circuit's ruling in *Dekalb*.

[33] Arguably, Section 18's three-year period is not one of repose, but one of limitations, since the statute explicitly prescribes that it is measured from the date the "cause of action accrued."  15 U.S.C. § 78r(c); *see Cal. Pub. Emps. Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2049 (2017) (statutes of limitations run from the date "when a cause of action accrues – that is, when the plaintiff can file suit and obtain relief," whereas statutes of repose run from "the date of the last culpable act or omission of the defendant").  In the event the three-year period is one of limitations and not repose, then it, like the one-year period, is subject to tolling pursuant to

## III.   THE COMPLAINT ADEQUATELY ALLEGES COMMON LAW CLAIMS

### A.   Plaintiffs Adequately Allege Claims for Common Law Fraud

"To establish common-law fraud, a plaintiff must prove: '(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.'"  *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 172-73 (2005) (quoting *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997)); *see also Nuveen Mun. Tr. ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown, P.C.*, 692 F.3d 283, 313 (3d Cir. 2012).

Plaintiffs have alleged common law fraud claims against PwC and the Valeant Defendants.  Only PwC has challenged the fraud claim, and only on the basis that Plaintiffs have failed to adequately allege PwC's "knowledge or belief."  PwC Br. at 15-16.  In opposition, Plaintiffs respectfully refer the Court to the extensive red flags known to or recklessly disregarded by PwC, and the resulting violations of GAAS, outlined in Section II.A.2, *supra*.  Such allegations are sufficient to allege PwC's "knowledge or belief" for purposes of Plaintiffs' common law fraud claim.  *See Kronfeld v. First Jersey Nat'l Bank*, 638 F. Supp. 1454, 1467 (D.N.J. 1986) (holding that scienter was adequately pled as to a common law fraud claim based on finding that scienter was adequately pled as to a securities fraud claim under Section 10(b)); *see also In re ORFA Sec. Litig.*, 654 F. Supp. 1449, 1462 (D.N.J. 1987) ("there will be a considerable overlap of evidence and proofs between the common law [fraud] claims and the federal securities claims").

---

*American Pipe*, and all of Plaintiffs' claims are timely even without resort to Sarbanes-Oxley's expanded limitations periods.

### B.        Plaintiffs Adequately Allege Claims for Aiding and Abetting Fraud[34]

To establish an aiding and abetting claim under New Jersey law, Plaintiffs must allege

"(1) the commission of a wrongful act; (2) knowledge of the act by the alleged aider-abettor; and

(3) the aider-abettor knowingly and substantially participated in the wrongdoing." *Morganroth*

*& Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 415 (3d Cir. 2003)

(citations omitted).  Here, Plaintiffs have adequately pled claims against PwC and the Valeant

Defendants[35] for aiding and abetting fraud.

### 1.        Valeant, Rosiello, and Pearson

Defendants Valeant, Rosiello, and Pearson[36] raise two challenges to Plaintiffs' aiding and

abetting claim.

First, these Defendants argue that Plaintiffs have not identified a tort that Defendants

have aided and abetted.  *See* Valeant Br. at 19.  But on the contrary, Plaintiffs do allege what tort

Defendants aided and abetted: "the concealment of the relationship between Valeant and Philidor

and the nature of that relationship, the promotion of Valeant's business with false and misleading

statements, and the racketeering alleged."  Moreover, the law is clear that Plaintiffs need only

show participation in "the commission of a wrongful act[.]"  *Morganroth*, 331 F.3d at 415.

Defendants cite *Tarr v. Ciasulli*, 181 N.J. 70, 84 (2004), for the proposition that "Plaintiffs'

failure to plead an underlying tort is fatal to their claim."  Valeant Br. at 19.  Yet, *Tarr* holds that

---

[34] The Complaint alleges that the Valeant Defendants and PwC "aided and abetted . . . the concealment of the relationship between Valeant and Philidor and the nature of that relationship, the promotion of Valeant's business with false and misleading statements, and the racketeering activity alleged" – namely, the alleged fraud.  ¶ 421.  To the extent Defendants interpret this claim to be one for aiding and abetting a violation of RICO, the distinction is immaterial: the same allegations of knowledge and assistance apply.

[35] All Defendants except PwC challenge Plaintiffs' aiding and abetting claims by arguing that a person cannot aid and abet himself.  *See* Valeant Br. at 19-20; Carro Br. at 14; Pearson Br. at 2; Schiller Br. at 4.  But tortfeasors can, of course, aid and abet one another, which is precisely what Plaintiffs have alleged here.

[36] Pearson relies on the arguments in Valeant's and Rosiello's brief.  *See* Pearson Br. at 2.

a plaintiff need only show that "the party whom the defendant aids must perform a wrongful act that causes an injury," in addition to knowledge and participation.  181 N.J. at 84.  Here, Plaintiffs have alleged precisely this.  ¶ 421; *see also* ¶ 423 (alleging that Defendants "knowingly and substantially assisted the principal tortious and wrongful conduct").  Defendants' attempt to use *Tarr* to support their position is thus unavailing.

Second, Valeant, Rosiello, and Pearson argue that the Complaint contains only "collectivized" allegations against them.[37]  This is simply untrue.  Plaintiffs detail a range of conduct and attribute it specifically to Valeant, Rosiello, and Pearson.  *See*, *e.g.*, ¶ 31 (describing Valeant's pursuit of the AF sales strategy through which it employed deceptive and illegal tactics to create a market for the sale of drugs at artificially inflated prices); ¶ 32 (describing how Valeant's financial disclosure statements concealed the true source of its sales and revenue growth); ¶ 34 (describing how Pearson led Valeant's aggressive acquisition and price gouging strategies and personally directed astronomical drug price increases); ¶ 35 (describing how Pearson personally "orchestrated the . . . concealment of the true drivers of Valeant's revenue growth and the resulting artificial inflation of the price of Valeant's securities); ¶ 36 (describing how Pearson signed all of Valeant's financial disclosure statements, including those that falsely attested to the integrity of Valeant's internal controls); ¶ 40 (describing how Rosiello "orchestrat[ed] Valeant's growth-by-acquisition, price gouging, and AF strategies, personally overs[aw] the preparation of Valeant's false and misleading financial statements, and repeatedly misrepresent[ed] to investors Valeant's relationship with Philidor and the degree to which Valeant relied on price, rather than volume, to drive revenue growth").

Additionally, this Court has rejected Defendants' attempt to mount similar group-

---

[37] Valeant, Rosiello, and Pearson concede their knowledge and substantial participation in the fraud by not challenging it.

pleading challenges to plaintiffs' allegations in the past. *See supra* at Section I.A.2.b.ii (citing *Valeant*, 2017 U.S. Dist. LEXIS 66037, at *37-38). Similarly here, Valeant, Rosiello, and Pearson should not be able to hide behind a group-pleading defense when there is, for example, evidence that each was intimately involved in the preparation and dissemination of materially false and misleading financial statements. *See Pfizer*, 2012 U.S. Dist. LEXIS 39454, at *20 (finding defendants liable where they "were involved in drafting, reviewing and/or disseminating the false and misleading financial statements that were issued ..., approved or ratified these statements and, therefore, adopted them as their own").

### 2. PwC

PwC incorrectly asserts that Plaintiffs fail to adequately plead (1) PwC's knowledge of wrongdoing, and (2) that PwC's assistance was substantial. PwC Br. at 21-22. Both arguments are misplaced.

Contrary to PwC's assertions, the Complaint details how PwC provided certain materially false "assurances to Valeant investors notwithstanding its *knowledge . . . of Valeant's relationship with Philidor*." ¶ 232 (emphasis added). The Complaint likewise alleges that PwC "had *direct knowledge* of the Philidor Option, as well as Valeant's consolidation of Philidor's sales in the Company's public financial statements." ¶ 60 (emphasis added). These allegations are hardly conclusory; rather, Plaintiffs allege that in interrogatory responses submitted to the U.S. Senate Special Committee on Aging, Philidor (through counsel) represented that PwC had evaluated Valeant's relationship with Philidor pursuant to normal audit procedures, subsequent to Valeant and Philidor entering into the purchase option agreement. ¶ 232. The interrogatory responses also indicated that Philidor communicated with PwC in the course of its "day-to-day business" to "satisfy any and all information requested," and that this information was utilized in PwC's year-end and quarterly audits. *Id.* PwC nonetheless certified that Valeant's financial

53

statements complied with GAAP and GAAS and that PwC's audit was conducted according to PCAOB standards.  Further, PwC signed off on Valeant's decision not to disclose its relationship with Philidor and its improper revenue recognition with respect to Philidor – an act of complicity that inflated Valeant's revenue and allowed it to meet financial targets.  *Id.*  Notably, Valeant's transactions related to Philidor were "significant unusual transactions" that posed a higher risk of fraud and thus, under PCAOB standards, required PwC to inquire further.  ¶¶ 125-26 (citing AU 316.66).  Indeed, the option to purchase Philidor was unique, involving the payment of $100 million upfront and potential milestone payments up to an additional $133 million, and was unusual relative to Valeant's normal course of business: up until then, Valeant had acquired pharmaceutical companies, not pharmacies.  ¶ 127.  In addition, as a distributor of Valeant, GAAP required Philidor and Valeant to evaluate whether the Philidor Option was negotiated in contemplation of other contracts (including sales contracts), particularly if those contracts were negotiated outside the Company's normal business practices.  *Id.*  Non-standard sales terms, large sales volumes, artificially inflated prices, and extended payment terms were all red flags that PwC saw and ignored or was willfully blind to.  *Id.*

PwC's ignorance of red flags is particularly egregious given Philidor's materiality to Valeant's financial statements.  Philidor was clearly significant to Valeant's business.  Valeant had agreed to pay up to $233 million to acquire Philidor, and in its 2014 10-K, disclosed two smaller transactions, namely acquisitions of specialty pharmacy Natur Produkt International, JSC ($149.9 million) and Gerot Lannach ($164 million); Valeant remained silent about Philidor, however, despite the fact that it accounted for $111 million in sales in 2014 ($58 million of which was later determined not to comply with GAAP).  ¶ 129.

Even Valeant's own treatment of Philidor strongly suggests what Valeant believed

54

Philidor to be material.  Indeed, Valeant specifically included Philidor in its SOX testing of internal controls over financial reporting.  ¶ 130.  And Valeant's subsequent restatement of Philidor-related revenue is itself an admission of the materiality of that revenue.  *Id.*

In light of these red flags, which are all pled in the Complaint and which the Court must accept as true at this stage, PwC's assertion that Plaintiffs have not adequately alleged its knowledge and assistance is difficult to fathom.  PwC's actions were indispensable to the success of the alleged fraud.  Indeed, had PwC fulfilled its role and completed a *bona fide* audit, investors would have learned of Valeant's fraudulent activities years earlier.  Instead, PwC lent its imprimatur to Valeant's financial statements, worked in concert with Valeant to perpetrate the alleged fraud, and actively concealed the fraud from investors, thus rendering substantial assistance to the fraud.  ¶¶ 123, 125-28, and 230-33.

Courts have frequently recognized aiding and abetting liability on the part of similarly situated independent auditors.  *See*, *e.g.*, *Starr Invs. Cayman II, Inc. v. China MediaExpress Holdings, Inc.*, No. 11-233-RGA, 2014 WL 4180331, at *8 (D. Del. Aug. 21, 2014) (declining to dismiss an aiding and abetting claim against an accountant where "[p]laintiff pled knowledge"); *Circle Bus. Credit, Inc. v. Becker*, No. 92-3177, 1994 WL 52848, at *3 (E.D. Pa. Feb. 18, 1994) (denying motion for summary judgment on auditor's aiding and abetting claim based on evidence that an accountant knowingly prepared false financial statements that were "critical to the scheme's success because it kept the investors satisfied that [the scam operation] was a legitimate enterprise"); *State, Dep't of Treasury, Div. of Inv. ex rel. McCormac v. Qwest Commc'ns Int'l, Inc.*, 904 A.2d 775, 782 (App. Div. 2006) (denying a motion to dismiss an aiding and abetting fraud claim against an accountant where plaintiffs put on evidence that the accountant knowingly helped to perpetrate the fraud); *In re Integrity Ins. Co.*, 573 A.2d 928,

939-41 (App. Div. 1990) (recognizing aiding and abetting fraud claims brought by a company liquidator against a company auditor for the auditor's active role in obscuring the company's true financial condition by preparing and disseminating false financial statements).

*Qwest* is particularly instructive. There, the Appellate Division reviewed a complaint which alleged that "[Arthur] Andersen aided and advised Qwest in performing its fraudulent reporting of earnings to inflate its stock price which caused NJT injury in the form of multi-million dollar losses when the fraud was disclosed." *Qwest*, 904 A.2d at 784. The plaintiff alleged that Arthur Andersen, Qwest's auditor, was "generally aware of [its] role as part of the overall illegal [ ] activity because it was an active participant and helped perpetrate the fraud; and Andersen knowingly and substantially assist[ed] Qwest with the creation and implementation of fraudulent accounting schemes to implement the fraud." *Id.* (internal quotation marks omitted). The court noted that "[t]he allegations are not merely that Andersen failed to detect Qwest's alleged fraudulent reporting of revenue and expenses, but that it actually facilitated the known fraud." *Id.* at 785. Accordingly, the court in *Qwest* concluded that the plaintiff had "pled the fundamental requisites of aiding and abetting fraud." *Id.* at 784.

The cases PwC cites are unavailing. In *Cafaro v. HMC Int'l, LLC*, No. 07-2793 (JLL), 2009 WL 1622825, at *4-5 (D.N.J. June 10, 2009), the court found that the allegations underpinning an aiding and abetting claim were so meager that they were "barely even consistent with unlawful activity by [the defendant], much less plausible under the *Twombly* standard." The court accordingly dismissed the claim. *See id.* Here, as detailed above, Plaintiffs have alleged knowing and substantial misconduct with particularity. Similarly, in *Miller v. P.G. Lewis & Assoc.*, No. 05-5641(FLW), 2007 WL 316446, at *6 (D.N.J. Jan. 30, 2007), the court found that the complaint was "devoid of any evidence to show that assistance . . . was given by either

56

[of the alleged aiders and abettors] to the . . . defendants" (internal quotations and citation omitted). This is hardly the case here. Finally, in *Meridian Horizon Fund, LP v. KPMG (Cayman)*, 487 F. App'x 636, 642-43 (2d Cir. 2012), the court affirmed the dismissal of aiding and abetting breach of fiduciary duty claims against KPMG. The court found no evidence to support the existence of a fiduciary duty between KPMG and the defendant and expressed doubt over whether the contacts between KPMG and the defendant "could be characterized as a relationship" at all. *See id.* Here, a breach of fiduciary duty claim is not at issue, and in any event, the relationship between PwC and Valeant ran deep.

Plaintiffs have thus adequately alleged a claim against PwC for aiding and abetting fraud.

### 3.  Schiller

Schiller also seeks dismissal of the aiding and abetting claim as to him. Schiller Br. at 4-5. To establish aiding and abetting liability, a plaintiff must prove that the defendant "knew of the commission of the substantive offense and acted with the intent to facilitate it." *United States v. Carbo*, 572 F.3d 112, 118 (3d Cir. 2009) (internal citations omitted). Here, Plaintiffs allege that "Schiller coordinated closely with senior Valeant and Philidor executives and was intimately involved in the planning, approval, direction, and monitoring of every aspect of the scheme, including directly authorizing the implementation of illegal practices in Valeant's AF program." ¶ 37. Additionally, Plaintiffs allege that Schiller, as the person "responsible for Valeant's financial accounting and reporting[,] . . . conceal[ed] the relationship between Valeant and Philidor by failing to disclose Philidor as a variable interest entity . . . in Valeant's year-end financial statements" – which he signed and certified. ¶¶ 38-39. Indeed, Plaintiffs specifically allege that Schiller thereby "*facilitated* the artificial inflation of the price of Valeant securities[.]" ¶ 38 (emphasis added). These allegations demonstrate Schiller's knowledge of the substantive offense and his intent to facilitate the scheme by his actions. Nothing more is required at this

stage of the litigation.

### 4. Carro

Finally, Carro seeks dismissal of the aiding and abetting claim as to her. Carro Br. at 13-14. Carro does not explicitly challenge Plaintiffs' allegations as to her knowing and substantial participation in the fraud. Notably, Plaintiffs have alleged both in great detail. In particular, Plaintiffs have alleged that Carro, in her capacity as Valeant's Controller, *inter alia*: supervised the preparation of false and misleading financial statements, ¶ 41; "directly authoriz[ed] the implementation of Philidor's illegal" practices surrounding its "AF program," *id.*; "orchestrat[ed] massive price increases of" multiple drugs, *id.*; and participated in the drafting, preparation, and/or approval of the various SEC filings, releases, and other public statements identified," ¶ 307. These allegations, together with Plaintiffs' other allegations, adequately plead Carro's knowledge of the fraud and her intent to facilitate the fraud through her assistance to others.

### C. Plaintiffs Adequately Allege Negligent Misrepresentation Claims

The Valeant Defendants and the Bank Offering Defendants argue that "New Jersey courts do not recognize [negligent misrepresentation] claims for securities investors." Valeant Br. at 20; Carro Br. at 13-14; Pearson Br. at 2; Schiller Br. at 5. Not so. On the contrary, the New Jersey Supreme Court has expressly held that stockholders can recover for negligent misrepresentation in corporate financial statements. *H. Rosenblum, Inc. v. Adler*, 461 A.2d 138, 142-43 (1983) (holding that buyer of stock may sue a corporation's outside auditor for negligent misrepresentations regarding the corporation's financial statements, and rejecting the view that the parties must be in privity).[38] Likewise, the Third Circuit has also held that New Jersey

---

[38] After *Rosenblum*, the New Jersey legislature, through the passage of N.J.S.A. 2A:53A-25 in 1995, sought to curtail auditor liability to third parties for negligence. The Supreme Court of New Jersey explained that its "decision in *Rosenblum* . . . had 'weakened' the necessity of privity between an accountant and a claimant bringing suit against him and explained that the [statute] restored the concept of privity to *accountants*' liability towards third parties.'" *Cast Art Indus.,*

recognizes a cause of action for negligent misrepresentation to investors who can plead direct

reliance. *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 289-90 (3d Cir. 1992) (claim of negligent

misrepresentation "extends to foreseeable individual investors who, as a result of their reliance

on negligently made misrepresentations, suffer economic loss").

Other courts are in line with this view. *See Lerch v. Citizens First Bancorp, Inc.*, 805 F.

Supp. 1142, 1156 (D.N.J. 1992) (denying a motion to dismiss where defendant asserted that

public investors had no standing to sue under a common law negligent misrepresentation theory);

*Urbach v. Sayles*, 779 F. Supp. 351, 365 (D.N.J. 1991) (holding that "representations to

individual investors can ground a negligent misrepresentation claim"); *In re Midlantic Corp.

S'holder Litig.*, 758 F. Supp. 226, 237 n.9 (D.N.J. 1990) (holding that "the ordinary public

investor remains" eligible to pursue a claim "under the negligent misrepresentation doctrine");

*Princeton Ophthalmic, LLC v. Corinthian Ophthalmic, Inc.*, No. 14-CV-05485 (PGS), 2017 WL

4543688, at *13 (D.N.J. Oct. 10, 2017) (denying a motion for summary judgment where the

plaintiff alleged negligent misrepresentation in connection with the purchase of Corinthian

stock); *Cornell Capital Partners, L.P. v. Eagle Broadband, Inc.*, No. 03-1860 (WGB), 2006 WL

1098175, at *8 (D.N.J. Mar. 28, 2006) (considering an investor's negligent misrepresentation

claim but dismissing it for want of evidence of injury); *In re Zenith Labs. Sec. Litig.*, No. 86-

3241A, 1993 WL 260683, at *12 (D.N.J. Feb. 11, 1993) ("New Jersey state and federal courts

have consistently recognized that shareholders are reasonably foreseeable recipients of

fraudulent misrepresentations within the meaning of New Jersey's law of negligent

---

*LLC v. KPMG LLP*, 209 N.J. 208, 223 (2012) (quoting Sponsor's Statement, Statement to Senate
Bill No. 826 (March 10, 1994) (emphasis added)).  Yet neither the New Jersey Legislature nor
the Supreme Court of New Jersey has disturbed *Rosenblum*'s conclusion that stockholders can
bring claims for negligent misrepresentation in corporate financial statements under New Jersey
common law.  *See id.* at 220-28; *E. Dickerson & Son, Inc. v. Ernst & Young, LLP*, 179 N.J. 500,
503-06 (2004).

misrepresentation."); *Bogart v. Nat'l Cmty. Banks, Inc.*, No. 90-5032, 1992 WL 203788, at *10

(D.N.J. Apr. 25, 1992) (denying a motion to dismiss a negligent misrepresentation claim where

"plaintiff allege[d] that defendants were negligent in supplying . . . false information to the

investing public in purchasing NCB securities at an inflated price"); *Shtutman v. Carr*, No. A-

1064-15T1, 2017 WL 4402045, at *6 (N.J. Super. Ct. App. Div. Oct. 4, 2017) (vacating the

denial of summary judgment of a negligent misrepresentation claim where the investor alleged

that the defendant omitted material facts in connection with the sale of certain securities).

Defendants rest their motion to dismiss this claim on an anomalous case, *Prudential Ins.*

*Co. of Am. v. Bank of Am., Nat'l Ass'n*, No. 13-1586 (SRC), 2015 WL 502039, at *4-7 (D.N.J.

Feb. 5, 2015), that directly contravenes the above-cited authorities.  *See* Valeant Br. at 20-21.

Notably, in analogous residential mortgage-backed securities cases brought by the same plaintiff,

the courts denied motions to dismiss the plaintiffs' negligent misrepresentation claims.  *See*

*Prudential Ins. Co. of Am. v. Credit Suisse Sec. (USA) LLC*, No. 12-7242 (KSH), 2013 WL

5467093, at *19-20 (D.N.J. Sept. 30, 2013); *Prudential Ins. Co. of Am. v. Goldman, Sachs &*

*Co.*, No. 12-6590 (SDW)(MCA), 2013 WL 1431680, at *8-9 (D.N.J. Apr. 9, 2013).  By contrast,

in *Bank of America*, the court found that defendants were immunized against liability for

negligent misrepresentation because "defendants were in the business of marketing securities"

and "not in the business of supplying guidance to others in their business transactions."  2015

WL 502039, at *6.

*Bank of America* flatly contradicts the overwhelming weight of authority and the Court

should not be guided by it.  In addition, its reasoning is flawed.  The court, expressing concerns

about "literally limitless" numbers of would-be investors creating "limitless" liability, found that

the investor plaintiffs were not sufficiently "identifiable" or "foreseeable" plaintiffs to state a

valid claim for negligent misrepresentation.  *See id.* at *5-6.  The *Bank of America* court cited *Kaufman v. I–Stat Corp.*, 735 A.2d 606, 613 (App. Div. 1999), *rev'd*, 165 N.J. 94 (2000), in support of this reasoning.  *See* 2015 WL 502039, at *6.  Defendants also cite *Kaufman*, and, like the *Bank of America* court, emphasize *Kaufman*'s holding that it would "decline to adopt a rule of liability which would create expansive potential liability for negligent misrepresentations that may affect the price of securities."  *See* 2015 WL 502039, at *6; Valeant Br. at 20-21.  But critically, in *Kaufman* – a class action – the court so held in reference to its finding that a purchaser of corporate securities could not rely on a *fraud-on-the-market theory* to maintain a claim for negligent misrepresentation.  *See* 735 A.2d at 612-13.  Upholding the Appellate Division's dismissal of the fraud-on-the-market-based negligent misrepresentation claim, the New Jersey Supreme Court added that the plaintiff's burden in demonstrating reliance in a negligent misrepresentation claim is designed to avert "potentially unlimited liability for the makers of the statements to parties other than those to whom the statements were made." *Kaufman v. i-Stat Corp.*, 165 N.J. 94, 109-10 (2000).  Put another way, the New Jersey Supreme Court explained that negligent misrepresentation claims contain a built-in limitation on liability – the element of reliance – that application of the fraud-on-the-market doctrine would undermine. 165 N.J. at 109-10.

In light of its reasoning, *Bank of America* has no application to the claims at hand.  This is not a class action, it is not subject to the fraud-on-the-market doctrine, actual reliance has been alleged, and the universe of plaintiffs is discrete: the New York City Funds.  Equally inapposite is *People Express Airlines v. Consol. Rail Corp.*, 100 N.J. 246, 263-64 (1985), yet another case relied upon by both Defendants and the *Bank of America* court.  *See* Valeant Br. at 20; 2015 WL 502039, at *6.  *People Express* – a 23 year-old case that predates almost all of the authority

above, in which an airline sued a railroad when a railway car crashed, emitted dangerous chemicals, and interrupted the airline's business – bears no factual resemblance to the matter at hand. *See generally* 100 N.J. 246. Here, there is nothing "fortuitous" about large institutional investors who were not only potential but *actual* purchasers of Valeant securities who directly relied on Valeant's public statements. *People Express* does not support Defendants' view.[39]

Accordingly, Plaintiffs state a valid claim for negligent misrepresentation.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' partial motions to dismiss.

---

[39] The Bank Offering Defendants argue that since they are in privity with Plaintiffs, New Jersey law does not permit a claim for negligent misrepresentation. Valeant Br. at 21. But even *Bank of America* recognizes that where, as here, third party brokers stand between the Bank Offering Defendants and Plaintiffs, privity is absent. 2015 WL 502039, at *4. The Bank Offering Defendants also argue that Restatement (Second) of Torts § 552 exempts them from liability, since they did not "suppl[y] guidance to others in their business transactions" as the Restatement prescribes. Valeant Br. at 21. Defendants cite no authority, however, which would limit liability for negligent representation in New Jersey to *only* that which conforms perfectly to the conduct set forth in the Restatement; the Restatement may describe one path to liability, but no authority suggests it is the exclusive one. Here, the Bank Offering Defendants (who both had special knowledge of Valeant, *see supra* at Statement of Facts, Section II.C) made misrepresentations directly to the New York City Funds in documents addressed to them. The suggestion that the Bank Offering Defendants could not have anticipated their liability to the New York City Funds is preposterous.

Dated:  April 12, 2018                    Respectfully submitted,


                                          / s / Michael B. Eisenkraft
                                          Michael B. Eisenkraft
                                          COHEN MILSTEIN SELLERS
                                              & TOLL PLLC
                                          88 Pine Street / 14th Floor
                                          New York, NY 10005
                                          Tel. (212) 838-7797
                                          meisenkraft@cohenmilstein.com


                                          Steven J. Toll (pro hac vice forthcoming)
                                          Julie Goldsmith Reiser (admitted pro hac vice)
                                          S. Douglas Bunch (pro hac vice forthcoming)
                                          Adam H. Farra (admitted pro hac vice)
                                          COHEN MILSTEIN SELLERS
                                              & TOLL PLLC
                                          1100 New York Avenue, N.W. / 5th Floor
                                          Washington, D.C. 20005
                                          Tel. (202) 408-4600
                                          stoll@cohenmilstein.com
                                          jreiser@cohenmilstein.com
                                          dbunch@cohenmilstein.com
                                          afarra@cohenmilstein.com

                                          Counsel for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I, Michael B. Eisenkraft, hereby certify that the foregoing was filed using the Court's

ECF system, which will serve copies on all counsel of record.


Dated:    April 12, 2018                    /s/ Michael B. Eisenkraft

                                            Michael B. Eisenkraft